## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FT. MEYERS DIVISION

EDWARD M. DOLLER, Individually
and on Behalf of All Others Similarly
Situated,

     Plaintiff,

v.

HERTZ GLOBAL HOLDINGS, INC.,
STEPHEN M. SCHERR, AND
ALEXANDRA BROOKS,

     Defendants.

Case No. 2:24-cv-00513-JLB-KCD

## <u>AMENDED CLASS ACTION COMPLAINT</u>

## **TABLE OF CONTENTS**

NATURE OF THE ACTION .................................................................2

JURISDICTION AND VENUE ..............................................................5

PARTIES...............................................................................................6

   I.     Plaintiff.........................................................................................6

   II.    Defendants.....................................................................................6

   III.   Relevant Non-Parties....................................................................7

ADDITIONAL SUBSTANTIVE FACTUAL ALLEGATIONS................9

   I.     Company Background....................................................................9

         A.    Hertz's Reportable Business Segments and Services ........................9

         B.    In Stocking its Fleet, Hertz Claims to Carefully Balance Supply and Demand..........................................................................11

   II.    Defendants Purport to Closely Monitor and Analyze Certain Key Performance Indicators to Measure Hertz's Financial Performance and Profitability ................................................................................12

   III.   Hertz Uses Internal Systems, Data, and Reports to Inform Demand Requirements at its Rental Locations ..........................................17

   IV.   Starting in 2022, Hertz Set Out to Expand its EV Fleet to Become One of the Largest EV Rental Fleets in the World, Without Regard to Cost or Demand ......................................................................................21

   V.    Demand for EVs Quickly Declines Due to Lack of Charging Stations and Because Customers Did Not Know How, or Did Not Like, to Drive EVs 24

   VI.   Hertz is Forced to Sell Off One-Third of Its Unprofitable EV Fleet Due to Lack of Demand and Overhauls its Executive Management Team ...........31

DEFENDANTS' MATERIAL CLASS PERIOD MISREPRESENTATIONS AND OMISSIONS ......................................................................................34

   I.     False and Misleading Statements in the January 6, 2023 CNBC Interview ......................................................................................34

   II.    False and Misleading Statements in the February 7, 2023 Earnings Call ..37

   III.   False and Misleading Statements in the February 7, 2023 CNBC Interview ......................................................................................44

IV.   False and Misleading Statements in the April 4, 2023 CNBC Interview ...47

V.    False and Misleading Statements in the April 27, 2023 Earnings Call ......49

VI.   False and Misleading Statements in the July 27, 2023 Earnings Call ........56

VII.  False and Misleading Statements During the July 27, 2023 CNBC
      Interview ..............................................................................................62

VIII. False and Misleading Statements in the August 10, 2023 J.P. Morgan
      Investor Conference ..............................................................................65

IX.   False and Misleading Statements in the August 16, 2023 CNBC
      Interview ..............................................................................................71

DEFENDANTS DISCLOSED THE TRUTH  THROUGH SEVERAL
DISCLOSURES ............................................................................................76

I.    October 26, 2023 Disclosure ....................................................................76

II.   January 11, 2024 Disclosure ....................................................................79

III.  April 25, 2024 Disclosure ........................................................................83

POST CLASS PERIOD EVENTS ..................................................................85

ADDITIONAL SCIENTER ALLEGATIONS....................................................87

I.    Electric Vehicles Were a Substantial Piece of Hertz's Growth Plan to
      "Lead the Way" to Become "the Largest EV Rental Fleet in North
      America" ...............................................................................................88

II.   Defendants' Admissions that Hertz Did Not Manage Its Fleet In
      Accordance with Demand ........................................................................89

III.  Defendants Knew Hertz Was Not Seeing Demand for EVs from Internal
      Company Reports Tracking Such Data........................................................91

IV.   Defendants Knew Hertz Was Not Seeing Demand for EVs from Internal
      Company Meetings .................................................................................93

V.    Defendants Knew the Carrying Values for Hertz's EV Fleet Were
      Overstated Because Hertz Was Unable to Sell the EVs at the Higher Book
      Values ..................................................................................................95

VI.   Suspiciously Timed Turnover in Hertz's Senior Management Supports
      Scienter................................................................................................96

VII.   Defendants Were Motivated to Issue False Statements to Ensure Hertz Did Not Violate Its Debt Covenants and to Obtain Badly Needed Funding to Refresh its Aging Fleet ................................................................................97

VIII.  Scherr's Executive Compensation Agreement Motivated Him to Artificially Inflate Hertz's Stock Price ........................................................99

LOSS CAUSATION.................................................................................................101

PRESUMPTION OF RELIANCE.............................................................................107

NO SAFE HARBOR ...............................................................................................109

CLASS ALLEGATIONS .........................................................................................110

COUNTS..................................................................................................................113

   I.    Count I.............................................................................................113

   II.   Count II............................................................................................115

PRAYER FOR RELIEF ..........................................................................................117

DEMAND FOR TRIAL BY JURY ..........................................................................117

Plaintiff Robert Stephens brings this action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC"), on behalf of himself and all persons and entities other than Defendants who purchased or otherwise acquired common stock of Hertz Global Holdings, Inc., between January 6, 2023 and April 24, 2024, inclusive, and were injured thereby (the "Class"). Herein, Defendant Hertz Global Holdings, Inc., together with its subsidiaries, are collectively referred to as "Hertz" or the "Company."

Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters. Plaintiff's information and belief is based on the Lead Counsel's investigation, which included, among other things: (i) review and analysis of the Company's public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) review and analysis of Defendants' other public statements, including the Company's press releases and interviews that Defendants participated in with various news sources; (iii) interviews with individuals who are former employees of the Company; (iv) review and analysis of reports of securities and financial analysts, news articles, and other commentary and analysis concerning the Company and the industry in which it operates; and (v) review of pertinent court filings.

Lead Counsel's investigation into the matters alleged herein is continuing, and many relevant facts are known only to, or are exclusively within the custody or control of, Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     Hertz rents vehicles through a network of Company-operated rental locations and franchisees and partners under the Hertz, Dollar and Thrifty brands in 160 countries globally.

2.     This securities fraud class action arises out of Defendants' decision to embark on a reckless spending spree to acquire enough Electric Vehicles ("EV") to comprise 25% of Hertz's overall fleet by the end of 2024 to fulfill the Company's goal of becoming "the largest EV rental fleet in North America and one of the largest in the world."

3.     While initial market testing indicated that consumers did want to rent EVs and, thus, EV demand would be far below Hertz's 25% goal, Defendants proceeded full speed ahead and aggressively purchased EVs, mainly Tesla EVs, throughout 2022 and 2023 for top dollar.

4.     Witnesses, however, confirmed that EV demand was low out of the gate and by Summer 2022, EV demand declined further because customers did

not want to rent them due to a lack of charging stations and because they did not know how, or want, to operate EVs. Accordingly, utilization of Hertz EVs hovered around 50% to 60% throughout the Class Period as compared to traditional Internal Combustion Engine ("ICE") vehicles with utilization customarily above 90%. EV demand stayed depressed throughout the Class Period, despite Defendants' desperate efforts to increase EV utilization by providing discounted pricing and trying to force customers that rented ICE vehicles into EVs.

5.     Despite a lack of demand for EVs, Defendants falsely told investors throughout the Class Period that "EV rental demand is very strong and strong across all aspects of our business," that Hertz had sufficient charging stations to meet EV demand, and that Hertz would "always keep our commitment to fleeting within the confines of demand." None of this was true. Defendants knew Hertz lacked demand for its EV fleet through Hertz's internal Tableau and CapGuard systems, as well as from internal Company meetings, reports and emails informing them that EV utilization was low, and customers simply did not want to rent EVs. Yet, Defendants concealed these facts from investors as their compensation was directly tied to Hertz's stock price.

6.     Defendants finally came clean less than two years after introducing EVs when they announced in October 2023 that Hertz needed to "tight[en] the EV supply in that channel and more accurately match[] the fleet to demand" resulting

in January 2024 with Hertz then revealing it was going to have to sell 20,000 EVs, or one-third of its EV fleet due to lack of demand. In connection with this announcement, Hertz disclosed it would have to take a massive write-off of $245 million to account for the inflated carrying values Hertz had on its books from acquiring Tesla EVs at top-dollar.

7.    Thereafter, on March 15, 2024, Defendant Scherr was abruptly terminated as Hertz's CEO without explanation, effective April 1, 2024.

8.    Then, in connection with Hertz's Q1 2024 earnings, Defendants revealed that Hertz would be selling an additional 10,000 EVs, bringing the total EV sales to 30,000, or *one half* of Hertz's EV fleet to "bring supply in line with natural demand that's being expressed" and "bring our fleet inside the demand curve." Hertz also recorded an additional $195 million write-off to mark-to-market its inflated EVs being sold.

9.    Defendants further revealed that, over the past two years, "*[w]e realized lower utilization than what we really want to be at on the EV fleet that we have*. And so as we think about the rotation of EVs out of the fleet, *which were producing lower utilization and replacing that with an ICE car, which we believe will run higher utilization* on." Accordingly, Defendants admitted that Hertz's plan to grow its EV fleet to 25% of Hertz's total fleet by 2024 lacked any reasonable basis and, thus, Hertz was no longer "out to achieve a fixed percentage

of our fleet being electric by date and time," with the Company's Chief Executive Officer ("CEO") admitting that Hertz had "been ahead of ourselves in the context of how quickly that will happen."

10. Upon the news revealed over three partially corrective disclosures, Hertz's stock price declined $5.49 per share, or 54% on abnormally high trading volume. Defendants' fraud as alleged herein caused investors to lose millions of dollars. Plaintiff now seeks damages individually and on behalf of the Class.

## JURISDICTION AND VENUE

11. The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

12. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, codified at 15 U.S.C. §78aa. In connection with the acts, conduct, and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the U.S. mail, interstate telephone communications, and the facilities of national securities exchanges.

13. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and Exchange Act Section 27 because many of the false and misleading statements were disseminated in or from the Middle District of Florida.

## PARTIES

### I.  Plaintiff

14.   Plaintiff Robert Stephens, Court-appointed Lead Plaintiff, was damaged by purchasing the Hertz common stock set forth in his certification (ECF 28-2), at artificially inflated prices during the Class Period caused by Defendants' materially false and misleading public statements.

### II.  Defendants

15.   Hertz Global Holdings, Inc., is a top-level holding company for Rental Car Intermediate Holdings, LLC, which wholly owns The Hertz Corporation ("Hertz Corp."). Hertz primarily rents vehicles through a network of Company-operated rental locations and franchisees and partners. According to the Company's Form 10-K for the year-ended December 31, 2023 (the "2023 Form 10-K"), Hertz's management consists of the same members as the management of Hertz Corp. Further, these individuals are officers of Hertz and Hertz Corp. and employees of Hertz Corp.

16.   Hertz, generally, through its subsidiaries, holds all of the revenue earning vehicles, property, plant and equipment and all other assets, including the ownership interests in consolidated and unconsolidated variable interest entities of the business. The Company's principal place of business is Estero, Florida and

its common stock trades on The Nasdaq Global Select Market ("Nasdaq") under the symbols "HTZ".

17. Defendant Stephen M. Scherr served as Chief Executive Officer and a member of the Company's Board from February 2022 to April 1, 2024. Scherr served as Chairperson of the Board from January 2023 to April 1, 2024. Prior to joining Hertz, Scherr spent nearly three decades at Goldman Sachs. Prior to joining Goldman Sachs, Scherr practiced law. Defendant Scherr was replaced as CEO, without explanation, by Wayne Gilbert West ("West"), effective April 1, 2024.

18. Defendant Alexandra D. Brooks served as Executive Vice President and Chief Financial Officer ("CFO") from July 2023 to June 30, 2024. Brooks previously served as Senior Vice President, Chief Accounting Officer of the Company from October 2020 to July 2023 and as Senior Vice President, Internal Audit from June 2020 to October 2020. Brooks was replaced as CFO by Scott M. Haralson on June 3, 2024.

## III. Relevant Non-Parties

19. CW1 was a former Revenue Management Analyst from before the Class Period through the third quarter of 2023 responsible for overseeing Hertz's fleet in the Western Region, comprised of parts of California, Oregon, Washington, and Hawaii. In this role, CW1 determined pricing for all rental cars,

stocking of inventory based on demand at the various locations and which locations should be open or closed based on available inventory. CW1 reported to a manager who reported to Director Michael Cangialosi, who reported to Vice President Adam Brady. Adam Brady reported to Darren Arrington, a VP who oversaw Revenue Management and Fleet Management, who reported to the CEO.

20.    CW2 was employed by Hertz as a Revenue Management Coordinator before the Class Period, as a Revenue Management Analyst from before the Class Period to February 2023, and as a Security Project Manager during the first three quarters of 2023. As a Revenue Management Coordinator, CW2 moved fleet around to where vehicles were needed.  As a Revenue Management Analyst, CW2 was responsible for fleet management and utilization in the Midwest region (Arkansas, Missouri, Indiana, Ohio, West Virginia, Virginia, Kentucky, Michigan, Wisconsin, Minnesota, Kansas, Iowa, and Oklahoma), managing $20 million per quarter in revenue with a fleet of over 6,000 cars.

21.    CW3 worked at Hertz as an Outside Wholesale Remarketing Representative from before the Class Period to January 2024. As an Outside Wholesale Remarketing Representative, CW3 was responsible for calling car dealerships in an effort to sell them cars that Hertz no longer wanted in its rental fleet. CW3 worked on a team that sold cars to dealerships across the country.

CW3's team sold cars to dealerships that purchased less than 100 cars per month, whereas a separate "Nationals" team at Hertz was responsible for selling to dealerships that purchased more than 100 cars per month. CW3 reported to the Midwestern Regional Manager named Andre LaRosa. This individual reported to a Program Manager, who reported to a VP, both of whom were based in Chicago.

22.    Darren Arrington ("Arrington") is the Executive Vice President of Revenue Management & Fleet Acquisition. Arrington previously served as Senior Vice President, North America Fleet Management of Hertz since October 2013. Arrington oversaw the Revenue Management and Fleet Management Teams and reported to Defendant Scherr.

**ADDITIONAL SUBSTANTIVE FACTUAL ALLEGATIONS**

**I.    Company Background**

**A. <u>Hertz's Reportable Business Segments and Services</u>**

23.    Hertz, through its subsidiaries, operates in two reportable business segments—Americas RAC and International RAC—that primarily rent vehicles through a network of Company-operated rental locations and franchisees and partners under the Hertz, Dollar and Thrifty brands in 160 countries globally. The Americas RAC segment generates over 80%, or the vast majority of Hertz's annual revenue, while the International RAC segment generates between 15 and 20% of its sales.

9

24.    Hertz offers car rental services through its Hertz, Dollar, and Thrifty brands to provide rental services to customers at different price points. Hertz purports to achieve synergies across its brands by, among other ways, utilizing a single fleet and fleet management team and, where applicable, combined vehicle maintenance, vehicle cleaning and back-office functions. The Company's profitability is primarily a function of the volume, mix and pricing of rental transactions and the utilization of vehicles, the related ownership cost of vehicles and other operating costs.

25.    In addition, Hertz partners with certain rideshare companies to offer vehicle rentals to their drivers in select cities in North America and Europe (the "Ride Share Program"). Through its Ride Share Program, consumers can rent vehicles on a longer-term basis than traditional business rentals. Hertz touts its Ride Share Program as a component of its "strategy to be an active participant in the future of mobility."

26.    According to its SEC filings, Hertz also has a "corporate operations" business segment, which assesses Company performance and allocates resources based upon the financial information it receives for its operating segments.

27.    CW1 and CW2 stated that Hertz is organized into five regions: (1) West (including parts of California, Oregon, Washington and Hawaii); (2) Southwest (including Nevada south through Texas); (3) Midwest (including

Arkansas, Missouri, Indiana, Ohio, West Virginia, Virginia, Kentucky, Michigan, Wisconsin, Minnesota, Kansas, Iowa, and Oklahoma); (4) Northeast (including Maine south through North Carolina); and (5) Southeast (including Georgia, Florida, Louisiana, Mississippi, Tennessee and South Carolina). Each region is overseen by a manager who oversees a team of approximately six to seven revenue analysts.

### B. In Stocking its Fleet, Hertz Claims to Carefully Balance Supply and Demand

28.    For the year ended December 31, 2023, Hertz operated a peak rental fleet in its Americas RAC and International RAC segments of approximately 467,000 vehicles and 124,600 vehicles, respectively. To ensure Hertz has the appropriate mix of vehicles in its fleet, Hertz must make significant expenditures to acquire vehicles, and as such, requires substantial liquidity to finance such expenditures. Hertz purports to finance the purchase of rental vehicles through ongoing global borrowing programs and cash from operations.

29.    Hertz offers a fleet of ICE vehicles (powered by a liquid fuel such as diesel or gasoline that is burnt, *e.g.*, combusted, to provide mobility) as well as EVs. In stocking its fleet, Hertz purports to ensure it appropriately balances supply and demand. Indeed, according to Defendant Scherr "[r]egardless of vehicle prices, we will always keep our commitment to fleeting within the confines of demand."

11

30.    In addition, Hertz has partnerships with certain Ride Share companies to provide EVs to drivers using their networks.  For example, Uber drivers who have had to own or lease their own cars can rent an EV from Hertz.

## II. Defendants Purport to Closely Monitor and Analyze Certain Key Performance Indicators to Measure Hertz's Financial Performance and Profitability

31.    According to the 2022 and 2023 Forms 10-K, Defendants closely monitor several key metrics, including Vehicle Utilization, Total Revenue Per Transaction Day, Total Revenue Per Unit Per Month and Transaction Days.

32.    Hertz's 2023 Form 10-K defines Vehicle Utilization as an "important key metric to management and investors as it is the measurement of the proportion of our vehicles that are being used to generate revenues relative to rentable fleet capacity. Higher Vehicle Utilization means more vehicles are being utilized to generate revenues." Hertz reported utilization for the Americas RAC segment of 79%, 79% and 81% for 2021, 2022 and 2023, respectively. *See* Figure 1. While Hertz does not break utilization out between vehicle types (*e.g.*, EVs and ICE), as discussed below, overall utilization was hovering at the same percentage throughout the Class Period, despite Hertz's increased fleet size, due to lower EV utilization.

33.    Hertz's Total Revenue Per Transaction Day ("Total RPD"), another key metric, is defined by Hertz as an "important key metric to management and

investors as it represents a measurement of the changes in underlying pricing in the vehicle rental business and encompasses the elements in vehicle rental pricing that management has the ability to control." Hertz reported an increase in Total RPD in the Americas RAC segment for the years 2021 and 2022 of 40% and 5%, respectively and a *decrease* for 2023 of 5%. *See* Figure 1. The significantly slower growth in Total RPD in 2022 and decrease in Total RPD in 2023 is consistent with CW accounts that EV utilization was low throughout the Class Period and because Hertz lowered EV pricing in an attempt to raise demand.



Figure 1

34.    Total Revenue Per Unit Per Month ("Total RPU") is defined as an "important key metric to management and investors as it provides a measure of revenue productivity relative to the number of vehicles in our rental fleet whether owned or leased ("Average Rentable Vehicles")." Defendants reported an

increase in Total RPU for the Americas RAC segment of 94% and 5% in 2021 and 2022, respectively, and a *decrease* in 2023 of 3%. *See* Figure 2. The significant decline in Total RPU growth in 2022 and decrease in Total RPU in 2023 is consistent with the CW accounts that EV utilization was low throughout the Class Period, even as Hertz was increasing the number of EVs in its fleet, as Hertz was deriving less revenue per vehicle per month from low EV utilization and having to offer lower rental prices.

35.    Hertz also tracks Transaction Days per year, which is defined as an "important key metric to management and investors as it represents the number of revenue generating days ("volume")" and "is used as a component to measure Total RPD and Vehicle Utilization." *See* Figure 2.



Figure 2

36.    Defendants discussed and reported on each of these key metrics in every quarterly earnings call before, during and after the Class Period.

37.    CW1 confirmed that the top three metrics CW1's department analyzed and monitored were utilization, vehicles "on rent" and rate per day ("RPD"). CW1's team was required to meet certain quarterly goals with respect to each metric that came from Arrington and was communicated to CW1.

38.    CW1 attended meetings with CW1's team twice per week throughout CW1's tenure during which CW1's team discussed the current market, areas of opportunity, vehicle utilization, rates and strategy changes, among other areas. While these meetings were typically attended by the analysts on CW1's team and CW1's manager, occasionally, the manager above CW1's manager, who oversaw the Western, Southwestern and Midwest regions, attended.

39.    CW1 also attended monthly regional meetings called Revenue Management All Hands meetings throughout CW1's tenure, attended by analysts and managers from all five regions as well as Adam Brady. According to CW1, in advance of the meetings, slide decks were prepared containing KPIs provided by the Data Visualization team and data from other teams. CW1 stated that such KPIs included utilization and vehicles on rent, among others. CW1 recalled that these slide decks were distributed in advance of the meetings and presented by the higher-ups such as Brady, to discuss each region's progress on meeting their

15

goals, as well as what was going on in the market and the Company overall. CW1 recalled that after the Revenue Management All Hands meeting, the slide decks were emailed to management.

40.    CW2 corroborated CW1's account that there were monthly Revenue Management All Hands meetings with the Regional Revenue Management Analyst groups from all regions also attended by General Managers for each location. Topics discussed in these monthly meetings, CW2 recalled, included the top ten airports for utilization, the top ten "off-airports" in terms of utilization, the highest revenue per unit per day, and more broadly if strategies were working well.  These monthly meetings were overseen by Natalie Rodriguez[1] and Adam Brady also attended. CW2 confirmed that slide-decks were presented during the meetings and distributed by email to the attendees after the meetings.

41.    CW2 confirmed that Hertz tracked revenue, utilization and other KPIs for Hertz's four categories of customers—leisure, corporate, government and rideshare. Leisure was the largest customer category, which CW2 estimated made up about 45% of Hertz's rentals, while corporate, government and rideshare represented approximately 30%, 15% and 10% of rentals, respectively. CW2 confirmed that leisure and corporate customers generally did not like EVs and

---

[1] Natalie Rodriguez has worked at Hertz since July 2004.  From November 2016 to January 2023, she was Senior Director Revenue Management, and since January 2023 she has been Vice President Revenue Management Operations.

government agencies would not rent EVs at all. CW2 was specifically told by Tamera Branham not rent to EVs to government agencies.[2]

42.    CW2 confirmed that tracking KPIs was "a part of the job" of a Revenue Management Analyst. Throughout CW2's tenure as a Revenue Management Analyst, CW2 tracked Utilization, Revenue per Transaction, Revenue per Unit, Revenue per Day, and Net Promoter Score (which reflected how well customers liked renting from Hertz and whether, for instance, the customers would rent from Hertz again.)  CW2 had to meet quarterly goals that were distributed by Arrington and Hertz's three North American Operations Leaders. CW2 believed that Arrington reported the results of the quarterly goals to upper management, including the CEO, likely in the form of a PowerPoint slide deck, throughout CW2's tenure.

## III.  Hertz Uses Internal Systems, Data, and Reports to Inform Demand Requirements at its Rental Locations

43.    Defendants use several internal systems to purportedly ensure Hertz has the right vehicles in its fleet to balance supply and demand at its rental locations. The systems used were a mix of Tableau, CapGuard, the Rate Management System ("RMS"), and Vehicle Admission Website ("VAW").

---

[2] Tamera Branham is the Director of Transportation at Hertz.

44.    CW1 stated that the Revenue Management Department for all
regions used the Tableau system, which reported, in real-time, on the number and
composition of the rental fleet for each location and reservations made so that
CW1's group could ensure each location had the necessary inventory to meet
reservations. For example, if a particular location had reservations for 10 SUVs,
but the rental location only had 5 available, it was CW1's job to move SUVs from
one location to another to meet reservation demands.

45.    According to CW1, Hertz used Tableau to generate "a slew" of
reports which could be produced on a very granular level. For instance, CW1
recalled that the Tableau system could provide information such as car type and
class, the percentage of the fleet that was EVs versus ICE vehicles, utilization by
car, car type, location and region and cancellations, among other data.

46.    CW2 also confirmed that the Revenue Management Analyst team
used Tableau to create reports. Such reports could be customized to reflect, for
instance, the utilization levels for specific car classes and specific fleet pools for
specific time periods.

47.    CW1 recalled that CW1 and all regions in the Revenue Management
Department used the CapGuard system to review live reservations and available
vehicles from the fleet and VAW to review details of how many vehicles were in
maintenance versus on the road and at certain locations. According to CW1, RMS

18

was used for pricing rentals based on competitor pricing, seasonality, and demand, among other factors. CW1 stated that the revenue analysts such as CW1 could change rates in the RMS system within certain predetermined parameters set by management.

48.    CW2 confirmed that CapGuard was a graphical representation of utilization levels for specific fleet categories, such as ICE and EV vehicles, and derived its utilization data from Hertz's RMS. CW2 generated a bi-weekly "CapGuard" report that CW2 forwarded to CW2's manager, Defelicio dos Santos ("dos Santos"), and other General Managers in the field.  Defelicio dos Santos is the Inbound Revenue Manager at Hertz and reported to Adam Brady.

49.    CW2 stated that dos Santos sent out other reports on a weekly basis and would insist that any updates and changes to CapGuard be made ahead of a certain time so that dos Santos could circulate reports to Hertz's leadership. KPIs in the reports were detailed down to the car level, pool-level, region-level, as well as revenue-per-unit, revenue per day, utilization, and revenue per transaction.

50.    According to CW1, the executive management team, which would include the CEO and CFO, had access to Tableau and CapGuard. CW2 also confirmed that Hertz's senior executives had complete access to Tableau and, through Tableau, could see all of the KPIs and other data for the whole Company.

51.     CW2 also used information from the RMS and VAW systems daily. According to CW2, all fleet utilization data is fed into VAW. RMS also had pricing data available in it.

52.     CW2 met bi-weekly with dos Santos about various markets, including markets that were having issues or struggling with utilization. Efforts to address a given location's struggles, CW2 said, might include adjusting pricing.

53.     Defendant Scherr confirmed the CW accounts, stating during an April 4, 2022 investor call, "a lot of what mobility is going to be driven off of is data. *We sit on a lot of it*. We know where cars are going, we know where people are going. We know where things are going. And so there's [a] real opportunity for Hertz to kind of take the hill, if you will, in the context of how mobility is [going to] play out."

54.     During a subsequent August 1, 2024 Earnings Call, then CEO West corroborated Scherr's earlier statement that Hertz closely monitored vehicle data, including demand, stating "we certainly see the booking patterns of our customers. We, of course, measure their desires in terms of fleet preferences."

55.     Thus, Defendants admittedly would have known that Hertz lacked demand for EVs and EV utilization was low throughout the Class Period.

IV.    **Starting in 2022, Hertz Set Out to Expand its EV Fleet to Become One
of the Largest EV Rental Fleets in the World, Without Regard to Cost
or Demand**

56.    On October 25, 2021, Hertz issued a press release entitled "Hertz
Invests in Largest Electric Vehicle Rental Fleet and Partners with Seven-Time
Super Bowl Champion Tom Brady to Headline New Campaign" announcing it
would be offering "the largest EV rental fleet in North America and one of the
largest in the world." As part of this initiative, Hertz disclosed it placed an initial
order for 100,000 Tesla EVs that would purportedly be received by the end of
2022 and that Hertz would install new EV charging infrastructure across the
Company's global operations. The Tesla purchase was estimated to comprise
approximately 20% of Hertz's goal to build a fleet comprised of 25% EVs.

57.    According to then interim CEO Mark Fields, "[t]he new Hertz is
going to lead the way as a mobility company, starting with the largest EV rental
fleet in North America and a commitment to grow our EV fleet and provide the
best rental and recharging experience for leisure and business customers around
the world."

58.    In an April 4, 2022 press release entitled "Hertz and Polestar
Announce Global Strategic Partnership to Accelerate Electric Vehicle Adoption,"
Defendants announced that Hertz had agreed to purchase 65,000 EVs from

Polestar over the next five years. According to Defendant Scherr during an April 4, 2022 interview on Bloomberg:

> [W]e're looking to build out, uh, the largest electric fleet in North America. Uh, this adding to what we have purchased from and will be continuing to purchase from Tesla, you know, puts us on this journey. Uh, Polestar has really developed a, uh, a very, uh, impressive automobile. And to add 65,000 over the next several years will really put us on a position where we can diversify the fleet and really meet what, uh, our customers are looking for. Whether they're individuals, corporates who are looking to fulfill their own carbon footprint objectives, and then fleets like Uber who want to put their, uh, riders into, uh, into EVs.

59. In the April 8, 2022 Proxy Statement, Hertz touted its commitment to EVs, and stated:

> We made a commitment to position ourselves at the center of modern mobility and entered into new and expanded relationships around EV and technology. We are also investing in new EV infrastructure across our global operations by installing a combination of Level 2 and Level 3 DC fast chargers throughout our network. We also entered into a partnership with Uber to provide EVs to drivers using the Uber network that can further accelerate the adoption of EVs.

60. According to Defendant Scherr, there was purportedly plenty of demand for EVs because "[n]ow companies want their, their employees in electric vehicles."

61. In a September 20, 2022 press release entitled "Hertz and GM Plan Major EV Expansion," Hertz announced that it intended to purchase another 175,000 EVs from General Motors over the following five years, which would include EV models from Chevrolet, Buick, GMC, Cadillac and BrightDrop,

22

expected to start being offered in the first quarter 2023. According to the release, this acquisition will encompass a "wide range of vehicle categories and price points[.]".

62.     During a November 4, 2022 CNN interview, Defendant Scherr touted "we are [] taking a number of bold initiatives, particularly around electric vehicles" and that Hertz's EV fleet is "a very distinguishing characteristic." Hertz was "now offering more than anyone [] the choice to [] take up in an electric vehicle." Indeed, Scherr said Hertz distinguishes itself from competitors because it offered "a broader choice of vehicle, including electric vehicles" and was aiming to have its fleet of electric vehicles at around 25% by the end of 2024. Scherr further touted during the November 4, 2022 CNN interview that Herz was expanding its business by offering EVs to Uber and Lyft drivers who rent EVs from Hertz to use in their Ride Share business.

63.     As demonstrated above, prior to and throughout the Class Period, Defendants were laser-focused on being a "first mover" to build the largest EV fleet in North America and the world. Indeed, CW1 and CW2 recalled that there was a very heavy focus on purchasing EVs in 2022 and 2023.

### V.   Demand for EVs Quickly Declines Due to Lack of Charging Stations and Because Customers Did Not Know How, or Did Not Like, to Drive EVs

64.    According to CW1, Hertz first introduced EVs in late 2021 or early 2022, mainly comprised of Teslas. While Hertz later added General Motors EVs to its fleet, CW1 recalled that approximately 60% of the EV fleet during CW1's tenure were Tesla EVs.

65.    CW1 stated that within the first six months from when Hertz first began offering EVs, demand began to decline as customers did not want to use them. According to CW1, one reason EV rental cars were unpopular among renters was because there were not enough charging stations and not enough employees at the location to take the EVs offsite to charging stations. CW1 recalled that some locations had only one or two charging stations and some were unable to get any onsite charging stations because the electric grid could not handle the capacity. CW1 further explained that there were different levels of charging stations and some locations only had Level 1 stations, which took hours to charge an EV.

66.    CW1 recalled that the other main reason customers did not want to rent Tesla EVs in particular was because they did not like the driving experience. According to CW1, about one year after Hertz first introduced Teslas in its rental

fleet, CW1 heard that customers were getting into more accidents due to the way Teslas handled and the driving experience.

67.    Thus, CW1 recalled that EV utilization began declining around six months after they were introduced because customers simply did not want to rent EVs. CW1 stated that utilization stayed down throughout CW1's tenure and EV utilization was about 20-25% less than ICE vehicle utilization throughout CW1's employment at Hertz.

68.    CW1 stated that the declining EV utilization was reflected in Tableau and CapGuard by at least the latter part of 2022 and in 2023.

69.    CW2, likewise, recalled that Hertz began acquiring EVs at the beginning of 2022. According to CW2, largescale deployment of EVs began in early Q2 2022 and before then, there had been some smaller deliveries of EVs.

70.    CW2 recalled that by summer 2022, there was no demand for EVs. CW2 recalled that starting in 2022, Hertz had wanted the EVs to be rented at Hertz's Tier 6 or Tier 7 rates, which were "above-average" rates that Hertz's customers were willing to pay for, say, a luxury vehicle or one in high-demand. However, because the EV "demand was not there," it was necessary to price the vehicles "much lower."  The pricing for the EVs was initially at Tier 6 and Tier 7 rates but after six to eight weeks, when demand did not materialize, the pricing began being "tiered down."  CW2 lowered the rental rates for the EVs to the

"standard car price," which was Tier 3, as directed by dos Santos. But then when the EVs were still not rented, CW2 had to lower the price below the standard car price, sometimes as low as $20 to $25.

71.    In the summer of 2022, CW2 went on a site visit called "Extra Hands" to Hertz's Minneapolis airport location. Extra Hands visits, CW2 stated, were an initiative that occurred every summer during the peak summer season by which Revenue Management personnel could go to help Hertz's top 20 airports within their region. The Minneapolis airport had recently received "a bunch of Teslas" and CW2 saw the EVs just sitting on the lots and was told by the site personnel about their "terrible utilization."  As part of the site visit in summer 2022, CW2 was directed to offer consumers a chance to upgrade their rental to an EV at the best rental price available at the location.  But when consumers found out the cars were EVs they did not want them.

72.    CW2 said that throughout CW2's employment, Hertz had been "onboarding more and more EVs," which had not made sense because CW2 had been unable to get these EVs rented even when lowering the rental rates to much lower than what Hertz had wanted for the vehicles.

73.    CW2 confirmed that at no time did the utilization rate for the EVs in CW2's region exceed 55% to 60%, and the same was true for 70% to 75% of the other regions in the country. The low utilization of 55% to 60% for EVs persisted

throughout CW2's employment and sometimes even went lower than that, as low as 30% to 35%.

74.    According to CW2, "everyone" was telling dos Santos that there was "no utilization" of the EVs and that the EVS were just "sitting on the lots."  CW2 questioned dos Santos about why Hertz continued buying EVs when the EVs already on hand were just sitting there and taking up space.  In reply, CW2 was told to just make it work.

75.    The lack of EV demand was also raised at the monthly Revenue Management All Hands meetings prior to and throughout the Class Period. CW1, CW2, Dos Santos, all of the VPs and Senior Managers in Revenue Management and Arrington attended the monthly Revenue Management All Hands meeting. CW2 said the reasons customers did not want to rent EVs included that customers were unfamiliar with EVs generally and they did not know how to charge the vehicles or how long it would take. Also, the cost to charge an EV was actually more expensive than filling a conventional gas-engine car in most regions.

76.    CW2 also confirmed that Hertz's charging infrastructure for EVs was terrible. Several of Hertz's locations did not have onsite charging available, and the locations had been given a fleet before a proper charging infrastructure was put into place. For instance, because the St. Louis location did not have any charging available, the General Manager had to send personnel offsite in order to

27

charge the EVs, which required personnel to spend upwards of an hour to an hour-and-a-half per vehicle. Several other General Managers complained to CW2 by phone or email that they did not know what to do in regards to charging the EVs at their locations and that they had to spend money having their employees go to and charge the EVs at offsite locations.  CW3 said that charging infrastructure was eventually put in but not until several months after delivery of EVs.

77.    CW3 corroborated CW1 and CW2's accounts, stating that CW3 knew EVs were not being rented during 2022 and 2023 because there were always a ton on the lot. Like CWs 1 and 2, CW3 recalled that customers did not want to rent EVs because they were unfamiliar with how to operate and charge them. CW3 said there was a small learning curve for customers who had never operated an EV before and there was a lot of innate fear among first-time EV drivers.

78.    According to CW1 and CW2, management would have been aware that EV demand and utilization had declined from Tableau and also because CW1 and Hertz's other revenue analysts ran reports from CapGuard and provided them to managers, directors, and VPs.

79.    Around February 2023, CW1's team was given a directive from Brady during the monthly Revenue Management All Hands meeting to increase rental prices on EVs because Hertz was not making enough money from them. It was CW1's understanding that this directive came from Arrington and a VP from

Finance. This rate increase, CW1 stated, hurt overall EV utilization as customers did not want to pay the higher prices.

80.    In order to increase EV rentals, CW1's team was told throughout most of CW1's tenure to give customers an EV rental, even though they had requested an ICE vehicle, so Hertz could report that there were more EVs on the road. CW1 knows this because CW1 viewed the data in the Tableau system which reported, by location, which vehicles were actually reserved by customers versus what was on the road.

81.    CW1 recalled that there were a lot of complaints from customers who rented ICE vehicles but were put in EVs because the EV was not charged or the customer was put in a Tesla EV when they did not want a Tesla due to dissatisfaction with the driving experience. CW1 knows this because the Operations Managers told CW1 about the complaints and sometimes even sent CW1 the customer complaints. CW1 was in contact with the Operations Managers multiple times per day about customer complaints, as well as demand, maintenance, staffing and trying to make sure EVs were charged so they could be rented.

82.    CW1 attended quarterly Global Townhall meetings in Hertz's cafeteria at its corporate headquarters in Estero, Florida held by Defendants on the same day as Hertz released quarterly earnings to the market. According to CW1,

everyone at the Company could attend and participate either in person or over video. CW1 recalled that during the Global Townhall meetings, Defendants always discussed the status and profitability of Hertz's EV fleet given its import to the Company. CW1 recalled that the CEO gave a presentation put up on a large screen that provided financial figures as well as information specifically on Hertz's EV fleet, such as utilization that quarter.

83.     CW1 recalled that during every quarterly Global Townhall meeting in 2023, Defendant Scherr discussed that Hertz was buying more and more EVs. CW1 and the Revenue Management team were confused by this decision because they were having difficulty enough putting the EVs Hertz had on the road, let alone new ones.

84.     CW2 also attended the quarterly, Company-wide, Global Townhall meetings in the cafeteria of the Hertz headquarters in Florida during which employees were addressed by the senior executives, including Defendant Scherr. CW2 recalls that at every Global Townhall meeting during CW2's tenure, the general message from Scherr regarding EVs was that they were "a great initiative" for the Company. However, it became clear to CW2 by Q2 2022 and throughout CW2's employment that the EVs were not going well and CW2 felt the CEO's positive representations about EVs at the Townhall meetings were at odds with what CW2 was personally witnessing.

85.    By the time CW1 left employment at Hertz, EVs were only being used at mainly airports and very small locations and for Ride Share.

86.    While Defendants knew Hertz did not have sufficient demand for its EV fleet, throughout the Class Period, they falsely told investors that "EV rental demand is very strong and strong across all aspects of our business" and Hertz had sufficient charging stations to meet EV demand.

## VI.    Hertz is Forced to Sell Off One-Third of Its Unprofitable EV Fleet Due to Lack of Demand and Overhauls its Executive Management Team

87.    CW3 stated that, to determine which vehicles Hertz had available to sell, CW3 accessed Hertz's corporate server and downloaded an Excel spreadsheet, which showed all of the vehicles available for sale by the Outside Wholesale Remarketing group. According to CW3, sales were reported in real-time so that the spreadsheet on the server for the whole Company was updated daily. The Excel spreadsheet, CW3 said, was emailed out every morning in an email blast to a large recipient list that included the sales reps, their managers and others. Thus, CW3's team and the other remarketing representatives in CW3's group, as well as the Nationals group, knew inventory levels for EVs available for sale every day. Since the spreadsheet was on a Company shared server, CW3 believed the executives would have had access to it.

88.    According to CW3, Hertz began increasing its sales of EVs around April 2023. For instance, in 2022, CW3 estimated there were around 15 EVs for

sale. But by April 2023, there were around 1,500 EVs available for sale. CW3 recalled that from April 2023 onward, the number of EVs for sale steadily increased every month such that by November and December 2023, there were about 3,000 EVs for sale and 80% to 90% of the total vehicles Hertz had for sale were EVs, mainly Tesla EVs. CW3 was told by colleagues that by February/March 2024, there were about 4,000 to 5,000 EVs for sale.

89.    CW3 confirmed that the reason EVs were being sold at an increasing rate throughout 2023 and into 2024 was because they were not being rented.

90.    According to CW3, this witness had difficulty selling EVs because Hertz had priced them too high in order to avoid losing money on them. CW3 recalled that during CW3's tenure, the EVs were typically priced $1,500 to $3,000 above the market value. Even though the Remarketing Representatives were allowed to extend discounts to dealers of up to $600 per EV, they were still overpriced and all of the dealers CW3 spoke with told CW3 Hertz's prices were too high. CW3 recalled that by April 2023, the EVs were overpriced by as much as $5,000 to $10,000 per EV.

91.    CW3 met with CW3's manager, Andre LaRosa, one-on-one, every month to discuss the status and profitability of car sales. CW3 believed that those meetings with CW3's manager were to prepare Mr. LaRosa for monthly meetings LaRosa had with senior executives, including the CEO, to discuss the status and

profitability of Hertz's Companywide car sales.

92.     However, Defendants did not disclose to investors that, internally, Defendants decided to start selling off the EV fleet at an increasing rate starting in the spring of 2023 because customers were not renting the EVs. Defendants also did not disclose that Hertz was having difficulty selling its EVs because they were materially over-priced, indicating the value Hertz was carrying on its books and reporting in the financial statements for EVs was materially overstated throughout the Class Period.

93.     Indeed, it was not until January 11, 2024 that Defendants finally revealed Hertz was forced to **sell** 20,000 EVs, or one-third of its EV fleet, due to lack of demand. Defendants would also reveal shortly thereafter that Hertz would have to take a massive, $245 million write-off, to reduce the asset value of the EVs on its books to the market rate—something Defendants knew about as far back as April 2023 when dealers repeatedly told Hertz's sales reps that Hertz's resale prices were too high.

94.     Just four days later, on January 15, 2024, director Jeffrey Nedelman advised Hertz that he would resign from the Board of Directors effective as January 19, 2024. Shortly thereafter, on March 15, 2024, the Company announced that Defendant Scherr was stepping down as CEO and being replaced by Wayne Gilbert West, effective April 1, 2024. Defendants gave no explanation for either

departure.

95.    In Hertz's first quarter release issued on April 25, 2024, Defendants
revealed that Hertz would be selling an additional 10,000 EVs from its
unprofitable fleet, bringing the total being sold to 30,000 EVs, or **50%** of Hertz's
EV fleet, due to lack of demand.

96.    Then, on June 3, 2024, Global announced it was replacing its CFO,
Alexandra Brooks, with Scott M. Haralson, reporting that Ms. Brooks was
purportedly "leaving the Company to pursue other opportunities but will remain
until the end of the month to ensure an orderly transition."

## DEFENDANTS' MATERIAL CLASS PERIOD MISREPRESENTATIONS AND OMISSIONS

97.    Throughout the Class Period Defendants made false statements to the
market regarding: (1) demand for EVs, (2) Defendants' purchases of vehicles
within the confines of demand; and (3) the adequacy and sufficiency of Hertz's
EV infrastructure charging stations. Plaintiff asserts that all statements set forth
below that are bolded and underlined were materially false and/or misleading
when made for the reasons set forth therein. Non-bolded statements are included
for context.

### I.    False and Misleading Statements in the January 6, 2023 CNBC Interview

98.    On January 6, 2023, Defendant Scherr participated in an interview

on CNBC's Squawk on the Street (the "January 6, 2023 CNBC Interview"). When asked during the January 6, 2023 Interview "what is the demand for, for EV rentals," Scherr responded "**EV rental demand is very strong and strong across all aspects of our business.**" After the interview, CNBC uploaded a video of the interview to its website with the caption, "Hertz CEO Stephen Scherr EV rental demand is strong across all aspects of our business."

99.    The above statement was materially false and misleading when made because overall EV rental demand had been declining since the second quarter of 2022 and had stayed depressed as customers did not want to rent EVs due to a lack of sufficient charging stations and/or because they either did not know how to drive EVS or were dissatisfied with the driving experience, as evidenced by:

a.  CW1 stated that by Q2 2022, demand for EVs began to decline as customers did not want to use EVs because there were not enough charging stations and customers did not like the driving experience, and demand stayed suppressed through at least CW1's departure in the third quarter 2023;

b.  CW1 recalled that EV utilization began to decline by Q2 2022 because customers did not want to rent EVs due to lack of charging stations and they did not like the driving experience. CW1 stated that EV utilization stayed down throughout CW1's tenure at about 20-25% less than ICE vehicle utilization, as would have been reflected in Tableau and CapGuard;

c.  CW2 stated that, by the summer of 2022, demand for EVs across the leisure, corporate and government segments had not materialized in any of Hertz's markets due to a lack of charging stations and customers did not know how, or like, to drive EVs so that EVs were

just sitting on the lot taking up space, requiring Hertz to lower its pricing, which still did not increase demand during CW2's tenure;

d.  CW2 attended a site visit in the summer of 2022 as part of the "Extra Hands" annual initiative where CW2 personally observed "a bunch of Teslas" sitting in the lot experiencing low utilization;

CW2 stated that EV utilization was between 55% to 60% in CW2's Midwestern US region, as well as for 70% to 75% of the other regions in the country, and was at that level throughout CW2's employment and sometimes fell as low as 30% to 35% in CW2's region;

e.  CW3 stated that during 2022 and 2023, there were always a ton of EVs on the lot because customers did not want to rent EVs as they were unfamiliar with how to operate and charge them;

f.  CW1's team was told throughout most of CW1's tenure to give customers an EV rental, even though they had requested an ICE vehicle, so Hertz could report that there were more EVs on the road. CW1 knows this because CW1 viewed the data in the Tableau system which reported, by location, which vehicles were actually reserved by customers versus what was on the road. CW1 recalled that this resulted in a lot of customer complaints, which CW1 learned from the Operations Managers CW1 spoke with multiple times per day;

g.  Defendants admitted they had to sell off 50% of Hertz's EV fleet to "tighten[] the EV supply" to "bring supply in line with natural demand that's being expressed[]" and "bring our fleet inside the demand curve[;]"

h.  Defendants further admitted that, due to Hertz's EV supply in excess of demand, Hertz "realized lower utilization than what we really want to be at on the EV fleet that we have[]" and, thus, Hertz would be replacing half of its EVs, "which were producing lower utilization and replacing that with an ICE car, which we believe will run higher utilization on[;]" and

i.  Defendants admitted that Hertz's aggressive purchasing goal to have its fleet consist of 25% EVs by 2024 lacked any reasonable basis and, thus, Hertz was no longer "out to achieve a fixed percentage of our

fleet being electric by date and time[]" as Defendants were "***ahead of ourselves in the context of how quickly that will happen***."

## II.    False and Misleading Statements in the February 7, 2023 Earnings Call

100.    On February 7, 2023, Defendants held an earnings call with analysts to discuss the Company's financial results for the year-ended December 31, 2022 ("Q4 2022 Earnings Call"). During the Q4 Earnings Call, Defendant Scherr falsely assured investors "<u>**we will always remain attentive to customer preference.**</u>" Defendants Scherr further claimed that:

> As we pursue growth, fleet and cost management remain our key levers should demand soften. <u>**While we are not seeing demand reduction today, we are positioned to confront that challenge should it materialize**</u>.

101.    The above statements were materially false and misleading when made because, by speaking about overall demand, Hertz put demand for EVs, a material part of Hertz's fleet and a significant growth initiative and focus touted by Defendants throughout 2021 to 2023, at issue. Contrary to Defendants' statements, EV demand was declining because customers did not want to rent EVs due to a lack of sufficient charging stations and because they did not know how to operate them or were dissatisfied with the driving experience. Thus, Hertz was seeing a reduction in demand. Further, by trying to force customers into EVs that did want them, Hertz was not "attentive to customer preference," as evidenced by:

a.    CW1 stated that by Q2 2022, demand for EVs began to decline as customers did not want to use EVs because there were not enough

charging stations and customers did not like the driving experience, and demand stayed suppressed through at least CW1's departure in the third quarter 2023;

b. CW1 recalled that EV utilization began declining by Q2 2022, because customers did not want to rent EVs due to lack of charging stations and they did not like the driving experience. CW1 stated that utilization stayed down throughout CW1's tenure and EV utilization was about 20-25% less than ICE vehicle utilization, as would have been reflected in Tableau and CapGuard;

c. CW2 stated that, by the summer of 2022, demand for EVs across the leisure, corporate and government segments  had not materialized in any of Hertz's markets due to a lack of charging stations and customers did not know how or like to drive EVs so that EVs were just sitting on the lot taking up space, requiring Hertz to lower its pricing, which still did not increase demand during CW2's tenure;

d. CW2 attended a site visit in the summer of 2022 as part of the "Extra Hands" annual initiative where CW2 personally observed "a bunch of Teslas" sitting in the lot experiencing low utilization;

e. CW2 stated that EV utilization was between 55% to 60% in CW2's Midwestern US region, as well as for 70% to 75% of the other regions in the country, and was at that level throughout CW2's employment and sometimes fell as low as 30% to 35% in CW2's region;

f. CW3 stated that during 2022 and 2023, there were always a ton of EVs on the lot because customers did not want to rent EVs as they were unfamiliar with how to operate and charge them;

g. CW1's team was told throughout most of CW1's tenure to give customers an EV rental, even though they had requested an ICE vehicle, so Hertz could report that there were more EVs on the road. CW1 knows this because CW1 viewed the data in the Tableau system which reported, by location, which vehicles were actually reserved by customers versus what was on the road. CW1 recalled that this

resulted in a lot of customer complaints, which CW1 learned from the Operations Manager CW1 spoke with multiple times per day;

h.  Defendants admitted they had to sell off 50% of Hertz's EV fleet to "tighten[] the EV supply" to "bring supply in line with natural demand that's being expressed" and "bring our fleet inside the demand curve;"

i.  Defendants further admitted that, due to Hertz's EV supply in excess of demand, Hertz "realized lower utilization than what we really want to be at on the EV fleet that we have[]" and, thus, Hertz would be replacing half of its EVs, "which were producing lower utilization and replacing that with an ICE car, which we believe will run higher utilization on[;]" and

j.  Defendants admitted that Hertz's aggressive purchasing goal to have its fleet consist of 25% EVs by 2024 lacked any reasonable basis and, thus, Hertz was no longer "out to achieve a fixed percentage of our fleet being electric by date and time[]" as Defendants were "***ahead of ourselves in the context of how quickly that will happen***, but that will happen."

102.  During the Q4 2022 Earnings Call, Defendants falsely represented that "**[r]egardless of vehicle prices, we will always keep our commitment to fleeting within the confines of demand.**"

103.  The above statements were materially false and misleading when made because, despite declining demand since Q2 2022, Hertz continued to acquire EVs from Tesla and General Motors and enter into agreements to acquire EVs from Polestar, as Defendants publicly reported in their press releases cited herein. In addition, CW1 and CW2 recalled that during the quarterly Global Townhall meetings in 2023, CEO, Defendant Scherr discussed that Hertz was

buying more and more EVs, yet CW1 and CW2 were confused by this decision because they were having difficulty enough putting the EVs Hertz had on the road, let alone new ones. Thus, Hertz was not "fleeting within the confines of demand" as evidenced by:

a. Hertz issued a press release on October 25, 2021 announcing an agreement to purchase 100,000 Tesla EVs by end of 2022, Hertz issued a press release on April 4, 2022 announcing Hertz agreed to purchase 65,000 EVs from Polestar over the next five years and Hertz issued a press release on September 20, 2022 announcing it intended to purchase another 175,000 EVs from General Motors over the following five years;

b. CW1 stated that by Q2 2022, demand for EVs began to decline as customers did not want to use EVs because there were not enough charging stations and customers did not like the driving experience, and demand stayed suppressed through at least CW1's departure in the third quarter of 2023;

c. CW1 recalled that EV utilization began declining by Q2 2022 because customers did not want to rent EVs due to lack of charging stations and they did not like the driving experience. CW1 stated that utilization stayed down throughout CW1's tenure and EV utilization was about 20-25% less than ICE vehicle utilization, as would have been reflected in Tableau and CapGuard;

d. CW2 stated that, by the summer of 2022, demand for EVs across the leisure, corporate and government segments had not materialized in any of Hertz's markets due to a lack of charging stations and customers did not know how or like to drive EVs so that EVs were just sitting on the lot taking up space, requiring Hertz to lower its pricing, which still did not increase demand during CW2's tenure;

e. CW2 attended a site visit in the summer of 2022 as part of the "Extra Hands" annual initiative where CW2 personally observed "a bunch of Teslas" sitting in the lot experiencing low utilization;

f.  CW2 stated that EV utilization was between 55% to 60% in CW2's Midwestern US region, as well as for 70% to 75% of the other regions in the country, and was at that level throughout CW2's employment and sometimes fell as low as 30% to 35% in CW2's region;

g.  CW1's team was told throughout most of CW1's tenure to give customers an EV rental, even though they had requested an ICE vehicle, so Hertz could report that there were more EVs on the road. CW1 knows this because CW1 viewed the data in the Tableau system which reported, by location, which vehicles were actually reserved by customers versus what was on the road. CW1 recalled that this resulted in a lot of customer complaints, which CW1 learned from the Operations Manager CW1 spoke with multiple times per day;

h.  Defendants admitted they had to sell off 50% of Hertz's EV fleet to "tighten[] the EV supply" to "bring supply in line with natural demand that's being expressed" and "bring our fleet inside the demand curve;"

i.  Defendants further admitted that, due to Hertz's EV supply in excess of demand, Hertz "realized lower utilization than what we really want to be at on the EV fleet that we have[]" and, thus, Hertz would be replacing half of its EVs, "which were producing lower utilization and replacing that with an ICE car, which we believe will run higher utilization on[;]" and

j.  Defendants admitted that Hertz's aggressive purchasing goal to have its fleet consist of 25% EVs by 2024 lacked any reasonable basis and, thus, Hertz was no longer "out to achieve a fixed percentage of our fleet being electric by date and time[]" as Defendants were "***ahead of ourselves in the context of how quickly that will happen***, but that will happen."

104.  During the question-and-answer portion of the Q4 2022 Earnings Call, an Oppenheimer analyst specifically inquired about demand for corporate business, and Defendant Scherr falsely assured investors that corporate demand

was "strong," that corporate customers were focused on EVs, and that demand

was "changing for the better:"

> In terms of the corporate business, I would say that January equally
> sort of told you of the continuation in demand. Demand was up 28%
> over January, again, with corporate demand coming back now closer
> to where we saw it. Importantly, I would tell you that if you look at
> contract renewals, and I made a comment to this in the prepared
> remarks, we're seeing near 100% contract renewal on our
> corporates[.] Importantly, they're getting renegotiated at higher
> prices. **Obviously, corporates are focused on EVs as an**
> **alternative to put their employees in to satisfy their own ESG**
> **commitment, but the corporate business is feeling quite good,**
> **very strong.**
>
> ***
>
> **One last point on corporate, I would raise with you, and that is if**
> **you look at the pattern of corporate demand, it too is changing**
> **for the better for us**, meaning, over the course of 2022, we saw an
> increase by about 20% for about 1.5 days to the duration of a
> corporate rental.

105.    The above statements were materially false and misleading when

made because demand for EVs, including corporate demand, was declining

because customers did not want to rent EVs due to a lack of sufficient charging

stations and because they did not know how to operate them or were dissatisfied

with the driving experience of EV, as evidenced by:

a.  CW1 stated that by Q2 2022, demand for EVs began to decline as
    customers did not want to use EVs because there were not enough
    charging stations and customers did not like the driving experience,
    and demand stayed suppressed through at least CW1's departure in
    the third quarter 2023;

b. CW1 recalled that EV utilization began declining by Q2 2022, because customers did not want to rent EVs due to lack of charging stations and they did not like the driving experience. CW1 stated that utilization stayed down throughout CW1's tenure and EV utilization was about 20-25% less than ICE vehicle utilization, as would have been reflected in Tableau and CapGuard;

c. CW2 stated that, by the summer of 2022, demand for EVs across the leisure, corporate and government segments had not materialized in any of Hertz's markets due to a lack of charging stations and customers did not know how or like to drive EVs so that EVs were just sitting on the lot taking up space, requiring Hertz to lower its pricing, which still did not increase demand during CW2's tenure;

d. CW2 attended a site visit in the summer of 2022 as part of the "Extra Hands" annual initiative where CW2 personally observed "a bunch of Teslas" sitting in the lot experiencing low utilization;

e. CW2 stated that EV utilization was between 55% to 60% in CW2's Midwestern US region, as well as for 70% to 75% of the other regions in the country, and was at that level throughout CW2's employment and sometimes fell as low as 30% to 35% in CW2's region;

f. CW3 stated that EVs were not being rented during 2022 and 2023 as there were always a ton on the lot because customers did not want to rent EVs as they were unfamiliar with how to operate and charge them;

g. CW1's team was told throughout most of CW1's tenure to give customers an EV rental, even though they had requested an ICE vehicle, so Hertz could report that there were more EVs on the road. CW1 knows this because CW1 viewed the data in the Tableau system which reported, by location, which vehicles were actually reserved by customers versus what was on the road. CW1 recalled that this resulted in a lot of customer complaints, which CW1 learned from the Operations Manager CW1 spoke with multiple times per day;

h. Defendants admitted they had to sell off 50% of Hertz's EV fleet to "tighten[] the EV supply" to "bring supply in line with natural

43

demand that's being expressed" and "bring our fleet inside the demand curve;"

i. Defendants further admitted that, due to Hertz's EV supply in excess of demand, Hertz "realized lower utilization than what we really want to be at on the EV fleet that we have[]" and, thus, Hertz would be replacing half of its EVs, "which were producing lower utilization and replacing that with an ICE car, which we believe will run higher utilization on[;]" and

j. Defendants admitted that Hertz's aggressive purchasing goal to have its fleet consist of 25% EVs by 2024 lacked any reasonable basis and, thus, Hertz was no longer "out to achieve a fixed percentage of our fleet being electric by date and time[]" as Defendants were "***ahead of ourselves in the context of how quickly that will happen***, but that will happen."

## III.  False and Misleading Statements in the February 7, 2023 CNBC Interview

106.    On February 7, 2023, Defendant Scherr participated in an interview with CNBC's Squawk on the Street (the "February 7, 2023 CNBC Interview"). During the February 7, 2023 CNBC Interview, Defendant Scherr was asked what he was "seeing in terms of both leisure and corporate demand," to which Defendant Scherr false stated responded that "part of what's happening is that **demand is not lessening at all**."

107.    The above statement is materially false and misleading when made because, by speaking about overall demand, Hertz put demand for EVs, a material part of Hertz's fleet and a significant growth initiative and focus touted by Defendants throughout 2021 to 2023, at issue. Contrary to Defendants' statement,

EV demand was declining because customers did not want to rent EVs due to a

lack of sufficient charging stations and because they did not know how to operate

them or were dissatisfied with the driving experience. Thus, Hertz was seeing a

reduction in demand, as evidenced by:

a. CW1 stated that by Q2 2022, demand for EVs began to decline as
customers did not want to use EVs because there were not enough
charging stations and customers did not like the driving experience,
and demand stayed suppressed through at least CW1's departure in
the third quarter 2023;

b. CW1 recalled that EV utilization began declining by Q2 2022
because customers did not want to rent EVs due to lack of charging
stations and they did not like the driving experience. CW1 stated that
utilization stayed down throughout CW1's tenure and EV utilization
was about 20-25% less than ICE vehicle utilization, as would have
been reflected in Tableau and CapGuard;

c. CW2 stated that, by the summer of 2022, demand for EVs across the
leisure, corporate and government segments had not materialized in
any of Hertz's markets due to a lack of charging stations and
customers did not know how or like to drive EVs so that EVs were
just sitting on the lot taking up space, requiring Hertz to lower its
pricing, which still did not increase demand during CW2's tenure;

d. CW2 attended a site visit in the summer of 2022 as part of the "Extra
Hands" annual initiative where CW2 personally observed "a bunch
of Teslas" sitting in the lot experiencing low utilization;

e. CW2 stated that EV utilization was between 55% to 60% in CW2's
Midwestern US region, as well as for 70% to 75% of the other
regions in the country, and was at that level throughout CW2's
employment and sometimes fell as low as 30% to 35% in CW2's
region;

f.  CW3 stated that EVs were not being rented during 2022 and 2023 as
    there were always a ton at the lot because customers did not want to
    rent EVs as they were unfamiliar with how to operate and charge
    them;

g.  CW1's team was told throughout most of CW1's tenure to give
    customers an EV rental, even though they had requested an ICE
    vehicle, so Hertz could report that there were more EVs on the road.
    CW1 knows this because CW1 viewed the data in the Tableau system
    which reported, by location, which vehicles were actually reserved
    by customers versus what was on the road. CW1 recalled that this
    resulted in a lot of customer complaints, which CW1 learned from
    the Operations Manager CW1 spoke with multiple times per day;

h.  Around February 2023, CW1's team was given a directive from
    Brady during the monthly Revenue Management All Hands meeting
    to increase rental prices on EVs to make up for lost revenue on EV
    rentals but the rate increase hurt overall EV utilization as customers
    did not want to pay the higher prices;

i.  Defendants admitted they had to sell off 50% of Hertz's EV fleet to
    "tighten[] the EV supply" to "bring supply in line with natural
    demand that's being expressed" and "bring our fleet inside the
    demand curve;"

j.  Defendants further admitted that, due to Hertz's EV supply in excess
    of demand, Hertz "realized lower utilization than what we really
    want to be at on the EV fleet that we have[]" and, thus, Hertz would
    be replacing half of its EVs, "which were producing lower utilization
    and replacing that with an ICE car, which we believe will run higher
    utilization on[;]" and

k.  Defendants admitted that Hertz's aggressive purchasing goal to have
    its fleet consist of 25% EVs by 2024 lacked any reasonable basis and,
    thus, Hertz was no longer "out to achieve a fixed percentage of our
    fleet being electric by date and time[]" as Defendants were "***ahead
    of ourselves in the context of how quickly that will happen***, but that
    will happen."

## IV.    False and Misleading Statements in the April 4, 2023 CNBC Interview

108.    On April 4, 2023, Defendant Scherr participated in an interview on CNBC's Squawk on the Street. In response to a question regarding current demand, Defendant Scherr falsely claimed any market worries were "misplaced" and assured investors that there would be "continued strength and demand" and even "accelerated bookings" for rental cars in 2023 across "*all*" markets:

> Interviewer:
> What are you seeing on demand? It feels like the market is starting to worry that, that this boom cannot hold up forever, especially given some of the big economic headwinds.
>
> Scherr:
> Well, as we look forward to the summer, I think **that concern is misplaced. I mean, what we're seeing coming out of the first quarter is continued strength and demand, uh, and accelerant into bookings, uh, and, uh, you know, strong, uh, price support, uh, in terms of where we are renting cars. And I would say that's across *all* markets**. (emphasis added). **Leisure has been strong, continues to be strong. Uh, the corporate business continues to play strongly**.

109.    The above statements were false and misleading when made because, by speaking about overall demand, Hertz put demand for EVs, a material part of Hertz's fleet and a significant growth initiative and focus touted by Defendants throughout 2021 to 2023, at issue. Contrary to Defendants' statement, EV demand was declining because customers did not want to rent EVs due to a lack of sufficient charging stations and because the did not know how to operate them or were dissatisfied with the driving experience of EVs. Thus, Hertz was not seeing

"continued strength and demand," as evidenced by:

a. CW1 stated that by Q2 2022, demand for EVs began to decline as customers did not want to use EVs because there were not enough charging stations and customers did not like the driving experience, and demand stayed suppressed through at least CW1's departure in the third quarter 2023;

b. CW1 recalled that EV utilization began declining by Q2 2022 because customers did not want to rent EVs due to lack of charging stations and they did not like the driving experience. CW1 stated that utilization stayed down throughout CW1's tenure and EV utilization was about 20-25% less than ICE vehicle utilization, as would have been reflected in Tableau and CapGuard;

c. CW2 stated that, by the summer of 2022, demand for EVs across the leisure, corporate and government segments had not materialized in any of Hertz's markets due to a lack of charging stations and customers did not know how or like to drive EVs so that EVs were just sitting on the lot taking up space, requiring Hertz to lower its pricing, which still did not increase demand during CW2's tenure;

d. CW2 attended a site visit in the summer of 2022 as part of the "Extra Hands" annual initiative where CW2 personally observed "a bunch of Teslas" sitting in the lot experiencing low utilization;

e. CW2 stated that EV utilization was between 55% to 60% in CW2's Midwestern US region, as well as for 70% to 75% of the other regions in the country, and was at that level throughout CW2's employment and sometimes fell as low as 30% to 35% in CW2's region;

f. CW3 stated that EVs were not being rented during 2022 and 2023 as there were always a ton at the lot because customers did not want to rent EVs as they were unfamiliar with how to operate and charge them;

g. CW1's team was told throughout most of CW1's tenure to give customers an EV rental, even though they had requested an ICE

vehicle, so Hertz could report that there were more EVs on the road. CW1 knows this because CW1 viewed the data in the Tableau system which reported, by location, which vehicles were actually reserved by customers versus what was on the road. CW1 recalled that this resulted in a lot of customer complaints, which CW1 learned from the Operations Manager CW1 spoke with multiple times per day;

h.  Around February 2023, CW1's team was given a directive from Brady during the monthly Revenue Management All Hands meeting to increase rental prices on EVs to make up for lost revenue on EV rentals but the rate increase hurt overall EV utilization as customers did not want to pay the higher prices;

i.  Defendants admitted they had to sell off 50% of Hertz's EV fleet to "tighten[] the EV supply" to "bring supply in line with natural demand that's being expressed" and "bring our fleet inside the demand curve;"

j.  Defendants further admitted that, due to Hertz's EV supply in excess of demand, Hertz "realized lower utilization than what we really want to be at on the EV fleet that we have[]" and, thus, Hertz would be replacing half of its EVs, "which were producing lower utilization and replacing that with an ICE car, which we believe will run higher utilization on[;]" and

k.  Defendants admitted that Hertz's aggressive purchasing goal to have its fleet consist of 25% EVs by 2024 lacked any reasonable basis and, thus, Hertz was no longer "out to achieve a fixed percentage of our fleet being electric by date and time[]" as Defendants were "***ahead of ourselves in the context of how quickly that will happen***, but that will happen."

## V.  False and Misleading Statements in the April 27, 2023 Earnings Call

110.  On April 27, 2023, Defendants held a call with analysts to discuss Hertz's first quarter 2023 results ("Q1 2023 Earnings Call"). During the Q1 2023 Earnings Call, Defendant Scherr falsely claim Hertz had "continued growth"

across **all** customer segments and projected growth in EV rentals of five times
more than in 2022, even though internally, Defendants knew demand for EVs was
declining and stayed low, stating:

> Hertz posted strong results in the first quarter, **reflecting continued
> growth in demand across our customer segments** and a stable
> pricing environment in both the U.S. and abroad.
> * * *
> Our fleet acquisition costs are generally aligned with vehicle delivery
> timing. As a result, we have been benefiting from recent price
> declines from EV OEMs. **We are forecasting nearly 2 million EV
> rentals in 2023, approximately 5x the number of the prior year**.

111.   The above statements were materially false and misleading when
made because Defendants implied Hertz was experiencing growth across all of its
customer segments, including EVs, and boldly predicted growth in 2023 for EVs
of five times that in 2022 when, in reality, EV demand had been declining since
Q2 2022 and expected to stay depressed because customers did not want to rent
EVs due to a lack of sufficient charging stations and they either did not know how
to operate them or were dissatisfied with the driving experience of EVs. Thus,
Hertz was not seeing "continued growth in demand" and Defendants' forecast of
5x EV growth lacked any reasonable basis, as evidenced by:

a. CW1 stated that by Q2 2022, demand for EVs began to decline as
   customers did not want to use EVs because there were not enough
   charging stations and customers did not like the driving experience,
   and demand stayed suppressed through at least CW1's departure in
   the third quarter 2023;

b. CW1 recalled that EV utilization began declining by Q2 2022 because customers did not want to rent EVs due to lack of charging stations and they did not like the driving experience. CW1 stated that utilization stayed down throughout CW1's tenure and EV utilization was about 20-25% less than ICE vehicle utilization, as would have been reflected in Tableau and CapGuard;

c. CW2 stated that, by the summer of 2022, demand for EVs across the leisure, corporate and government segments had not materialized in any of Hertz's markets due to a lack of charging stations and customers did not know how or like to drive EVs so that EVs were just sitting on the lot taking up space, requiring Hertz to lower its pricing, which still did not increase demand during CW2's tenure;

d. CW2 attended a site visit in the summer of 2022 as part of the "Extra Hands" annual initiative where CW2 personally observed "a bunch of Teslas" sitting in the lot experiencing low utilization;

e. CW2 stated that EV utilization was between 55% to 60% in CW2's Midwestern US region, as well as for 70% to 75% of the other regions in the country, and was at that level throughout CW2's employment and sometimes fell as low as 30% to 35% in CW2's region;

f. CW3 stated that EVs were not being rented during 2022 and 2023 as there were always a ton at the lot because customers did not want to rent EVs as they were unfamiliar with how to operate and charge them;

g. CW1's team was told throughout most of CW1's tenure to give customers an EV rental, even though they had requested an ICE vehicle, so Hertz could report that there were more EVs on the road. CW1 knows this because CW1 viewed the data in the Tableau system which reported, by location, which vehicles were actually reserved by customers versus what was on the road. CW1 recalled that this resulted in a lot of customer complaints, which CW1 learned from the Operations Manager CW1 spoke with multiple times per day;

h.  Around February 2023, CW1's team was given a directive from Brady during the monthly Revenue Management All Hands meeting to increase rental prices on EVs to make up for lost revenue on EV rentals but the rate increase hurt overall EV utilization as customers did not want to pay the higher prices;

i.  Defendants admitted they had to sell off 50% of Hertz's EV fleet to "tighten[] the EV supply" to "bring supply in line with natural demand that's being expressed" and "bring our fleet inside the demand curve;"

j.  Defendants further admitted that, due to Hertz's EV supply in excess of demand, Hertz "realized lower utilization than what we really want to be at on the EV fleet that we have[]" and, thus, Hertz would be replacing half of its EVs, "which were producing lower utilization and replacing that with an ICE car, which we believe will run higher utilization on[;]" and

k.  Defendants admitted that Hertz's aggressive purchasing goal to have its fleet consist of 25% EVs by 2024 lacked any reasonable basis and, thus, Hertz was no longer "out to achieve a fixed percentage of our fleet being electric by date and time[]" as Defendants were "***ahead of ourselves in the context of how quickly that will happen***, but that will happen."

112.  Scherr also gave the false impression during the Q1 2023 Earnings Call that Hertz was growing its charging stations sufficient to service its fleet of EVs when, in reality, demand for EVs was declining due to a lack of charging stations:

> In terms of charging, **our proprietary network of charging stations continues to grow, so as to service our fleet**. Through our partnership with bp Pulse, we are accelerating the build-out of EV charging infrastructure at Hertz locations in major U.S. cities to serve both our customers and the driving public.

113.  The above statements were materially false and misleading when

made because Hertz lacked sufficient charging stations to service its EV fleet, as

evidenced by:

a.  The fact, according to CW1, by Q2 2022, demand for EVs began to
    decline as customers did not want to use EVs because there were not
    enough charging stations and demand stayed suppressed for this
    reason through at least CW1's departure in the third quarter 2023;

b.  CW1 recalled that EV utilization began declining by Q2 2022,
    because customers did not want to rent EVs due to lack of charging
    stations. CW1 stated that utilization stayed down throughout CW1's
    tenure and EV utilization was about 20-25% less than ICE vehicle
    utilization, as would have been reflected in Tableau and CapGuard;

c.  CW2 stated that, by the summer of 2022, demand for EVs across the
    leisure, corporate and government segments had not materialized in
    any of Hertz's markets due to a lack of charging stations so that EVs
    were just sitting on the lot taking up space, requiring Hertz to lower
    its pricing, which still did not increase demand during CW2's tenure;

d.  CW1 recalled that even at Hertz's rental locations, it did not have
    sufficient (or sometimes any) charging stations and, thus, Hertz's
    own charging stations did not keep the EV fleet running;

e.  CW2 stated that, throughout CW2's employment, Hertz's locations
    did not have onsite charging stations regularly available, and
    approximately 30% of Hertz's locations received EVs before a
    proper charging infrastructure was put into place, including the St.
    Louis location, which required the General Manger of that location
    to have personnel take the EV offsite to find a charging station to
    charge the EVs;

f.  CW2 stated that EV utilization was between 55% to 60% in CW2's
    Midwestern US region, as well as for 70% to 75% of the other
    regions in the country, and was at that level throughout CW2's
    employment and sometimes fell as low as 30% to 35% in CW2's
    region; and

g. CW3 stated that EVs were not being rented during 2022 and 2023 as there were always a ton at the lot because customers did not want to rent EVs as they were unfamiliar with how to operate and charge them.

114. Also, on the Q1 2023 Earnings Call, both Defendants Scherr and Brooks falsely affirmed that they would keep fleet size within the expected demand curves:

> Scherr: That said, **we remain committed to our strategy of growing fleet to sit inside expected demand** and underwriting investment decisions through the lens of returns over the prescribed period of car ownership.
>
> * * *
>
> Brooks: With regards to fleet, average fleet size grew to 505,000 vehicles in the quarter as we began to gear up for the expected spring and summer demand, **always with the intention of maintaining fleet inside the demand curve**. Net DPU for the quarter was $252 which was below the low end of the range we quoted on our last earnings call of $300.

115. The above statements were materially false and misleading when made because despite declining demand since Q2 2022, Hertz continued to acquire EVs, as Defendants publicly reported in their press releases cited herein. In addition, CW1 and CW2 recalled that during the quarterly Global Townhall meetings in 2023, CEO, Defendant Scherr discussed that Hertz was buying more and more EVs, yet CW1 and CW2 were confused by this decision because they were having difficulty enough putting the EVs Hertz had on the road, let alone new ones. Thus, Hertz was not "maintaining fleet inside the demand curve" as evidenced by:

a. Hertz issued a press release on October 25, 2021 announcing an agreement to purchase 100,000 Tesla EVs by end of 2022, Hertz issued a press release on April 4, 2022 announcing Hertz agreed to purchase 65,000 EVs from Polestar over the next five years and Hertz issued a press release on September 20, 2022 announcing it intended to purchase another 175,000 EVs from General Motors over the following five years;

b. CW1 stated that by Q2 2022, demand for EVs began to decline as customers did not want to use EVs because there were not enough charging stations and customers did not like the driving experience, and demand stayed suppressed through at least CW1's departure in the third quarter 2023;

c. CW1 recalled that EV utilization began declining around six months after they were introduced, or by Q2 2022, because customers did not want to rent EVs due to lack of charging stations and they did not like the driving experience. CW1 stated that utilization stayed down throughout CW1's tenure and EV utilization was about 20-25% less than ICE vehicle utilization, as would have been reflected in Tableau and CapGuard;

d. CW2 stated that, by the summer of 2022, demand for EVs across the leisure, corporate and government segments had not materialized in any of Hertz's markets due to a lack of charging stations and customers did not know how or like to drive EVs so that EVs were just sitting on the lot taking up space, requiring Hertz to lower its pricing, which still did not increase demand during CW2's tenure;

e. CW2 attended a site visit in the summer of 2022 as part of the "Extra Hands" annual initiative where CW2 personally observed "a bunch of Teslas" sitting in the lot experiencing low utilization;

f. CW2 stated that EV utilization was between 55% to 60% in CW2's Midwestern US region, as well as for 70% to 75% of the other regions in the country, and was at that level throughout CW2's employment and sometimes fell as low as 30% to 35% in CW2's region;

g. CW3 stated that EVs were not being rented during 2022 and 2023 as there were always a ton at the lot because customers did not want to rent EVs as they were unfamiliar with how to operate and charge them;

h. CW1's team was told throughout most of CW1's tenure to give customers an EV rental, even though they had requested an ICE vehicle, so Hertz could report that there were more EVs on the road. CW1 knows this because CW1 viewed the data in the Tableau system which reported, by location, which vehicles were actually reserved by customers versus what was on the road. CW1 recalled that this resulted in a lot of customer complaints, which CW1 learned from the Operations Manager CW1 spoke with multiple times per day;

i. Defendants admitted they had to sell off 50% of Hertz's EV fleet to "tighten[] the EV supply" to "bring supply in line with natural demand that's being expressed" and "bring our fleet inside the demand curve;"

j. Defendants further admitted that, due to Hertz's EV supply in excess of demand, Hertz "realized lower utilization than what we really want to be at on the EV fleet that we have[]" and, thus, Hertz would be replacing half of its EVs, "which were producing lower utilization and replacing that with an ICE car, which we believe will run higher utilization on[;]" and

k. Defendants admitted that Hertz's aggressive purchasing goal to have its fleet consist of 25% EVs by 2024 lacked any reasonable basis and, thus, Hertz was no longer "out to achieve a fixed percentage of our fleet being electric by date and time[]" as Defendants were "***ahead of ourselves in the context of how quickly that will happen***, but that will happen."

## VI.    False and Misleading Statements in the July 27, 2023 Earnings Call

116.    On July 27, 2023, Defendants held a call with analysts to discuss Hertz's second quarter 2023 results ("Q2 2023 Earnings Call"). In the Q2 2023 Earnings Call, Defendant Scherr falsely assured that there was more fleet

available to serve the demand *across new ventures*, and there was *no* evidence at

all of softening demand:

> Staying with fleet for a moment, we are benefiting from increased
> operational productivity as evidenced by a material reduction in out-
> of-service and more efficient maintenance turns. But simply, we are
> making more fleet available for more revenue earning activities,
> which better enables us to serve **base demand as well as demand**
> **across our new ventures**, including rideshare and our revitalized
> value brands. Think of lower out of service is helping to fund growth
> in the business **As we open the third quarter, there is no current**
> **evidence of softening demand**.

117.    The above statements were materially false and misleading when

made because by speaking about overall demand, Hertz put demand for EVs, a

material part of Hertz's fleet and a significant growth initiative and focus touted

by Defendants throughout 2021 to 2023, at issue. Contrary to Defendants'

statement, EV demand was declining because customers did not want to rent EVs

due to a lack of sufficient charging stations and because they did not know how

to operate them or were dissatisfied with the driving experience of EVs. Thus,

Hertz was seeing a reduction in demand, as evidenced by:

a.  CW1 stated that by Q2 2022, demand for EVs began to decline as
    customers did not want to use EVs because there were not enough
    charging stations and customers did not like the driving experience,
    and demand stayed suppressed through at least CW1's departure in
    the third quarter 2023;

b.  CW1 recalled that EV utilization began declining around six months
    after they were introduced, or by Q2 2022, because customers did not
    want to rent EVs due to lack of charging stations and they did not
    like the driving experience. CW1 stated that utilization stayed down

throughout CW1's tenure and EV utilization was about 20-25% less than ICE vehicle utilization, as would have been reflected in Tableau and CapGuard;

c. CW2 stated that, by the summer of 2022, demand for EVs across the leisure, corporate and government segments had not materialized in any of Hertz's markets due to a lack of charging stations and customers did not know how or like to drive EVs so that EVs were just sitting on the lot taking up space, requiring Hertz to lower its pricing, which still did not increase demand during CW2's tenure;

d. CW2 attended a site visit in the summer of 2022 as part of the "Extra Hands" annual initiative where CW2 personally observed "a bunch of Teslas" sitting in the lot experiencing low utilization;

e. CW2 stated that EV utilization was between 55% to 60% in CW2's Midwestern US region, as well as for 70% to 75% of the other regions in the country, and was at that level throughout CW2's employment and sometimes fell as low as 30% to 35% in CW2's region;

f. CW3 stated that EVs were not being rented during 2022 and 2023 as there were always a ton at the lot because customers did not want to rent EVs as they were unfamiliar with how to operate and charge them;

g. CW1's team was told throughout most of CW1's tenure to give customers an EV rental, even though they had requested an ICE vehicle, so Hertz could report that there were more EVs on the road. CW1 knows this because CW1 viewed the data in the Tableau system which reported, by location, which vehicles were actually reserved by customers versus what was on the road. CW1 recalled that this resulted in a lot of customer complaints, which CW1 learned from the Operations Manager CW1 spoke with multiple times per day;

h. Around February 2023, CW1's team was given a directive from Brady during the monthly Revenue Management All Hands meeting to increase rental prices on EVs to make up for lost revenue on EV

rentals but the rate increase hurt overall EV utilization as customers did not want to pay the higher prices;

i.  Defendants admitted they had to sell off 50% of Hertz's EV fleet to "tighten[] the EV supply" to "bring supply in line with natural demand that's being expressed" and "bring our fleet inside the demand curve;"

j.  Defendants further admitted that, due to Hertz's EV supply in excess of demand, Hertz "realized lower utilization than what we really want to be at on the EV fleet that we have[]" and, thus, Hertz would be replacing half of its EVs, "which were producing lower utilization and replacing that with an ICE car, which we believe will run higher utilization on[;]" and

k.  Defendants admitted that Hertz's aggressive purchasing goal to have its fleet consist of 25% EVs by 2024 lacked any reasonable basis and, thus, Hertz was no longer "out to achieve a fixed percentage of our fleet being electric by date and time[]" as Defendants were "***ahead of ourselves in the context of how quickly that will happen***, but that will happen."

118.  During the question-and-answer portion of the Q2 2023 Earnings Call, an analyst asked about demand trends in July, which Defendant Scherr falsely assured "overall" demand was "very strong" when, in fact, EV demand was declining:

Moore: Hi, good morning. Thank you. I think you gave a little bit of color of the trends that you were seeing in July, but maybe if we could just flesh that out a little bit. If you could just touch on the demand trends you've seen in July and how that's compared to maybe normal seasonality?

Scherr: [] I think **overall, very strong demand**, of which we're going to find other channels to feed it even more and continued strength in price, again, in a very stable rate environment relative to

what we otherwise might have seen or cynically thought would come, again, with a slightly looser availability of cars and so forth.

119.   Defendant Scherr also falsely reassured investors that utilization was elevated across the whole of the business, when, in fact, EV utilization was always much lower than ICE:

> Stathoulopoulos: And of course, your thoughts with how you see what looks to be a lot of pent-up demand, but certainly, the last segment to recover with respect to travel playing out into the back half?
>
> Scherr: Sure. Great. So just as a baseline, okay? It's important to realize that we've been -- we ran in Q2 at an 82% utilization. And **we are signaling to you that we will take that even higher in the context of our fleet. And that's not price driven, as I said, that's fleet driven. So we calibrate the fleet, and we'll take it down to sort of maintain very high levels of utilization**, so as to maintain price and the like. **I raised that because across the whole of the business, all geographies are contributing to an elevated level of view.**

120.   The above statements were materially false and misleading when made because by speaking about overall demand and utilization for Hertz's entire fleet, Hertz put demand and utilization for EVs, a material part of Hertz's fleet and a significant growth initiative and focus touted by Defendants throughout 2021 to 2023, at issue. Contrary to Defendants' statement, EV demand and utilization were declining because customers did not want to rent EVs due to a lack of sufficient charging stations and because they did not know how to operate them or were dissatisfied with the driving experience of EVs. Thus, Hertz had

seen, and continued to experience, a reduction in demand and utilization, as evidenced by:

a. CW1 stated that by Q2 2022, demand for EVs began to decline as customers did not want to use EVs because there were not enough charging stations and customers did not like the driving experience, and demand stayed suppressed through at least CW1's departure in the third quarter 2023;

b. CW1 recalled that EV utilization began declining around six months after they were introduced, or by Q2 2022, because customers did not want to rent EVs due to lack of charging stations and they did not like the driving experience. CW1 stated that utilization stayed down throughout CW1's tenure and EV utilization was about 20-25% less than ICE vehicle utilization, as would have been reflected in Tableau and CapGuard;

c. CW2 stated that, by the summer of 2022, demand for EVs across the leisure, corporate and government segments had not materialized in any of Hertz's markets due to a lack of charging stations and customers did not know how or like to drive EVs so that EVs were just sitting on the lot taking up space, requiring Hertz to lower its pricing, which still did not increase demand during CW2's tenure;

d. CW2 attended a site visit in the summer of 2022 as part of the "Extra Hands" annual initiative where CW2 personally observed "a bunch of Teslas" sitting in the lot experiencing low utilization;

e. CW2 stated that EV utilization was between 55% to 60% in CW2's Midwestern US region, as well as for 70% to 75% of the other regions in the country, and was at that level throughout CW2's employment and sometimes fell as low as 30% to 35% in CW2's region;

f. CW3 stated that EVs were not being rented during 2022 and 2023 as there were always a ton at the lot because customers did not want to rent EVs as they were unfamiliar with how to operate and charge them;

g. CW1's team was told throughout most of CW1's tenure to give customers an EV rental, even though they had requested an ICE vehicle, so Hertz could report that there were more EVs on the road. CW1 knows this because CW1 viewed the data in the Tableau system which reported, by location, which vehicles were actually reserved by customers versus what was on the road. CW1 recalled that this resulted in a lot of customer complaints, which CW1 learned from the Operations Manager CW1 spoke with multiple times per day;

h. Around February 2023, CW1's team was given a directive from Brady during the monthly Revenue Management All Hands meeting to increase rental prices on EVs to make up for lost revenue on EV rentals but the rate increase hurt overall EV utilization as customers did not want to pay the higher prices;

i. Defendants admitted they had to sell off 50% of Hertz's EV fleet to "tighten[] the EV supply" to "bring supply in line with natural demand that's being expressed" and "bring our fleet inside the demand curve;"

j. Defendants further admitted that, due to Hertz's EV supply in excess of demand, Hertz "realized lower utilization than what we really want to be at on the EV fleet that we have" and, thus, Hertz would be replacing half of its EVs, "which were producing lower utilization" and "replacing that with an ICE car, which we believe will run higher utilization on;" and

k. Defendants admitted that Hertz's aggressive purchasing goal to have its fleet consist of 25% EVs by 2024 lacked any reasonable basis and, thus, Hertz was no longer "out to achieve a fixed percentage of our fleet being electric by date and time" as Defendants were "***ahead of ourselves in the context of how quickly that will happen***, but that will happen."

## VII. False and Misleading Statements During the July 27, 2023 CNBC Interview

121. On July 27, 2023, Defendant Scherr participated in an interview on CNBC's Squawk on the Street (the "July 27, 2023 CNBC Interview"). When

asked during the July 27, 2023 CNBC Interview about Hertz's positive outlook for the second half of 2023, Scherr cited "**continued strength in the [] demand**" that would be "more permanent:"

> <u>Interviewer</u>: I mean, on the call you said, you know, on rate for the balance of 20, uh, 23 is for year over year comparisons to improve sequential uptick in both rate and demand into Q3. So what are you seeing, uh, that gives you a more positive outlook for the second half of the year?

> <u>Scherr</u>: Well, good to be with you, David. I mean, what **we're seeing is just continued strength in the in demand**, and it's not just here in the us, it's equally in Europe. Uh, and um, part of that is a function of, uh, greater confidence among the consumer. You heard it yesterday in some of the Fed discussion, uh, disinflation and the consumer sort of playing strong. Uh, and **so we continue to see considerable demand, you know, such that this doesn't appear to be kind of a momentary surge or a revenge, if you will, coming out of Covid. There's something that feels a bit more permanent to this**. …

122.    The above statements were materially false and misleading when made because by speaking about overall demand, Hertz put demand for EVs, a material part of Hertz's fleet and a significant growth initiative and focus touted by Defendants throughout 2021 to 2023, at issue. Contrary to Defendants' statement, EV demand was declining because customers did not want to rent EVs due to a lack of sufficient charging stations and because they did not know how to operate them or were dissatisfied with the driving experience of EVs. Thus, Hertz was seeing a reduction in demand and EV demand was far from "permanent," as evidenced by:

a.  CW1 stated that by Q2 2022, demand for EVs began to decline as customers did not want to use EVs because there were not enough charging stations and customers did not like the driving experience, and demand stayed suppressed through at least CW1's departure in the third quarter 2023;

b.  CW1 recalled that EV utilization began declining around six months after they were introduced, or by Q2 2022, because customers did not want to rent EVs due to lack of charging stations and they did not like the driving experience. CW1 stated that utilization stayed down throughout CW1's tenure and EV utilization was about 20-25% less than ICE vehicle utilization, as would have been reflected in Tableau and CapGuard;

c.  CW2 stated that, by the summer of 2022, demand for EVs across the leisure, corporate and government segments had not materialized in any of Hertz's markets due to a lack of charging stations and customers did not know how or like to drive EVs so that EVs were just sitting on the lot taking up space, requiring Hertz to lower its pricing, which still did not increase demand during CW2's tenure;

d.  CW2 attended a site visit in the summer of 2022 as part of the "Extra Hands" annual initiative where CW2 personally observed "a bunch of Teslas" sitting in the lot experiencing low utilization;

e.  CW2 stated that EV utilization was between 55% to 60% in CW2's Midwestern US region, as well as for 70% to 75% of the other regions in the country, and was at that level throughout CW2's employment and sometimes fell as low as 30% to 35% in CW2's region;

f.  CW3 stated that EVs were not being rented during 2022 and 2023 as there were always a ton at the lot because customers did not want to rent EVs as they were unfamiliar with how to operate and charge them;

g.  CW1's team was told throughout most of CW1's tenure to give customers an EV rental, even though they had requested an ICE vehicle, so Hertz could report that there were more EVs on the road. CW1 knows this because CW1 viewed the data in the Tableau system

which reported, by location, which vehicles were actually reserved by customers versus what was on the road. CW1 recalled that this resulted in a lot of customer complaints, which CW1 learned from the Operations Manager CW1 spoke with multiple times per day;

h. Around February 2023, CW1's team was given a directive from Brady during the monthly Revenue Management All Hands meeting to increase rental prices on EVs to make up for lost revenue on EV rentals but the rate increase hurt overall EV utilization as customers did not want to pay the higher prices;

i. Defendants admitted they had to sell off 50% of Hertz's EV fleet to "tighten[] the EV supply" to "bring supply in line with natural demand that's being expressed" and "bring our fleet inside the demand curve;"

j. Defendants further admitted that, due to Hertz's EV supply in excess of demand, Hertz "realized lower utilization than what we really want to be at on the EV fleet that we have" and, thus, Hertz would be replacing half of its EVs, "which were producing lower utilization" and "replacing that with an ICE car, which we believe will run higher utilization on;" and

k. Defendants admitted that Hertz's aggressive purchasing goal to have its fleet consist of 25% EVs by 2024 lacked any reasonable basis and, thus, Hertz was no longer "out to achieve a fixed percentage of our fleet being electric by date and time" as Defendants were "***ahead of ourselves in the context of how quickly that will happen***, but that will happen."

## VIII.    False and Misleading Statements in the August 10, 2023 J.P. Morgan Investor Conference

123.   On August 10, 2023, Defendants spoke at a J.P. Morgan Investor Conference (the "August 10, 2023 J.P. Morgan Conference"). During the August 10, 2023 J.P. Morgan Conference, Defendant Scherr touted as the "headline" that "demand remains very strong:"

**<u>Well, I would say that at a headline demand remains very strong</u>**.
We don't see through the lens of our business weakness in the
consumer…

\*       \*       \*

**<u>The cliff, if you will, that everybody had assumed the consumer
was going to fall off, and we would see demand sort of fall away
has simply not happened</u>**.

\*       \*       \*

And obviously, as I mentioned here, we're using the opportunity of
strong demand to take rate up. So I think we're in a period of stability
around rate. **<u>We continue to see strong demand to sort of feed it.
We are running our fleet at an elevated level of utilization against
historical standards</u>**, yet we're running fleet at a very tight tolerance
as is the industry to where a sellout situation exists. It's not as acute
as it was in '22, but the industry is not running at a fleet size that's
30%, 20%. It's low single digits above that, which the industry would
otherwise be in a sold-out position. You've heard me on cost.

124.   The above statements were materially false and misleading when
made because by speaking about overall demand and utilization, Hertz put
demand and utilization for EVs, a material part of Hertz's fleet and a significant
growth initiative and focus touted by Defendants throughout 2021 to 2023, at
issue. Contrary to Defendants' statement, EV demand was declining because
customers did not want to rent EVs due to a lack of sufficient charging stations
and because they did not know how to operate them or were dissatisfied with the
driving experience of EVs. Thus, demand was not "strong" and utilization was not
"elevated," as evidenced by:

a. CW1 stated that by Q2 2022, demand for EVs began to decline as
customers did not want to use EVs because there were not enough
charging stations and customers did not like the driving experience,

and demand stayed suppressed through at least CW1's departure in the third quarter 2023;

b. CW1 recalled that EV utilization began declining around six months after they were introduced, or by Q2 2022, because customers did not want to rent EVs due to lack of charging stations and they did not like the driving experience. CW1 stated that utilization stayed down throughout CW1's tenure and EV utilization was about 20-25% less than ICE vehicle utilization, as would have been reflected in Tableau and CapGuard;

c. CW2 stated that, by the summer of 2022 demand for EVs across the leisure, corporate and government segments had not materialized in any of Hertz's markets due to a lack of charging stations and customers did not know how or like to drive EVs so that EVs were just sitting on the lot taking up space, requiring Hertz to lower its pricing, which still did not increase demand during CW2's tenure;

d. CW2 attended a site visit in the summer of 2022 as part of the "Extra Hands" annual initiative where CW2 personally observed "a bunch of Teslas" sitting in the lot experiencing low utilization;

e. CW2 stated that EV utilization was between 55% to 60% in CW2's Midwestern US region, as well as for 70% to 75% of the other regions in the country, and was at that level throughout CW2's employment and sometimes fell as low as 30% to 35% in CW2's region;

f. CW3 stated that EVs were not being rented during 2022 and 2023 as there were always a ton at the lot because customers did not want to rent EVs as they were unfamiliar with how to operate and charge them;

g. CW1's team was told throughout most of CW1's tenure to give customers an EV rental, even though they had requested an ICE vehicle, so Hertz could report that there were more EVs on the road. CW1 knows this because CW1 viewed the data in the Tableau system which reported, by location, which vehicles were actually reserved by customers versus what was on the road. CW1 recalled that this

resulted in a lot of customer complaints, which CW1 learned from the Operations Manager CW1 spoke with multiple times per day;

h. Around February 2023, CW1's team was given a directive from Brady during the monthly Revenue Management All Hands meeting to increase rental prices on EVs to make up for lost revenue on EV rentals but the rate increase hurt overall EV utilization as customers did not want to pay the higher prices;

i. Defendants admitted they had to sell off 50% of Hertz's EV fleet to "tighten[] the EV supply" to "bring supply in line with natural demand that's being expressed" and "bring our fleet inside the demand curve;"

j. Defendants further admitted that, due to Hertz's EV supply in excess of demand, Hertz "realized lower utilization than what we really want to be at on the EV fleet that we have" and, thus, Hertz would be replacing half of its EVs, "which were producing lower utilization" and "replacing that with an ICE car, which we believe will run higher utilization on;" and

k. Defendants admitted that Hertz's aggressive purchasing goal to have its fleet consist of 25% EVs by 2024 lacked any reasonable basis and, thus, Hertz was no longer "out to achieve a fixed percentage of our fleet being electric by date and time" as Defendants were "*ahead of ourselves in the context of how quickly that will happen*, but that will happen."

125. Also, during the August 10, 2023 J.P. Morgan Conference, Defendant Scherr was asked about corporate demand for EVs, which he falsely claimed was seeing growth in corporate space and that "without exception" there was a pickup in EV rentals:

The other thing I would say about our corporate business, perhaps uniquely is that **we're seeing continued growth in the utilization of electric vehicles in the corporate space**. This is where companies are looking to satisfy not just the base need for an employee to be in

a rental car, but satisfying certain sustainability objectives that they have and putting their employee in an electric vehicle.

I'll just tell you, anecdotally, we engaged, I engaged in a series of letters and e-mails with the CEOs of most of our major corporate clients. And in that, I engage them in the proposition that, in fact, the EV did present an interesting opportunity for them to sort of satisfy sustainability objectives, which have been always elusive and the SEC has obviously been on everyone on the veracity of those claims, but this was a very real way to satisfy that. And I think **without exception, we have seen in companies with whom we've engaged, a pickup, literally just in the last month or 2 around the take-up of EVs in the component of business**. And so I think that's an edge that **we will continue to sort of pursue in the growth in our corporate business**.

126.   The above statements were materially false and misleading when made because EV demand was declining because customers did not want to rent EVs due to a lack of sufficient charging stations and because they did not know how to operate them or were dissatisfied with the driving experience of EVs. Thus, Hertz was not seeing a "pickup" in growth and demand in the EV corporate space, as evidenced by:

a.   CW1 stated that by Q2 2022, demand for EVs began to decline as customers did not want to use EVs because there were not enough charging stations and customers did not like the driving experience, and demand stayed suppressed through at least CW1's departure in the third quarter 2023;

b.   CW1 recalled that EV utilization began declining around six months after they were introduced, or by Q2 2022, because customers did not want to rent EVs due to lack of charging stations and they did not like the driving experience. CW1 stated that utilization stayed down throughout CW1's tenure and EV utilization was about 20-25% less than ICE vehicle utilization, as would have been reflected in Tableau and CapGuard;

c.  CW2 stated that, by the summer of 2022, demand for EVs across the leisure, corporate and government segments had not materialized in any of Hertz's markets due to a lack of charging stations and customers did not know how or like to drive EVs so that EVs were just sitting on the lot taking up space, requiring Hertz to lower its pricing, which still did not increase demand during CW2's tenure;

d.  CW2 attended a site visit in the summer of 2022 as part of the "Extra Hands" annual initiative where CW2 personally observed "a bunch of Teslas" sitting in the lot experiencing low utilization;

e.  CW2 stated that EV utilization was between 55% to 60% in CW2's Midwestern US region, as well as for 70% to 75% of the other regions in the country, and was at that level throughout CW2's employment and sometimes fell as low as 30% to 35% in CW2's region;

f.  CW3 stated that EVs were not being rented during 2022 and 2023 as there were always a ton at the lot because customers did not want to rent EVs as they were unfamiliar with how to operate and charge them;

g.  CW1's team was told throughout most of CW1's tenure to give customers an EV rental, even though they had requested an ICE vehicle, so Hertz could report that there were more EVs on the road. CW1 knows this because CW1 viewed the data in the Tableau system which reported, by location, which vehicles were actually reserved by customers versus what was on the road. CW1 recalled that this resulted in a lot of customer complaints, which CW1 learned from the Operations Manager CW1 spoke with multiple times per day;

h.  Around February 2023, CW1's team was given a directive from Brady during the monthly Revenue Management All Hands meeting to increase rental prices on EVs to make up for lost revenue on EV rentals but the rate increase hurt overall EV utilization as customers did not want to pay the higher prices;

i.  Defendants admitted they had to sell off 50% of Hertz's EV fleet to "tighten[] the EV supply" to "bring supply in line with natural demand that's being expressed" and "bring our fleet inside the demand curve;"

j.  Defendants further admitted that, due to Hertz's EV supply in excess of demand, Hertz "realized lower utilization than what we really want to be at on the EV fleet that we have" and, thus, Hertz would be replacing half of its EVs, "which were producing lower utilization" and "replacing that with an ICE car, which we believe will run higher utilization on;" and

k.  Defendants admitted that Hertz's aggressive purchasing goal to have its fleet consist of 25% EVs by 2024 lacked any reasonable basis and, thus, Hertz was no longer "out to achieve a fixed percentage of our fleet being electric by date and time" as Defendants were "***ahead of ourselves in the context of how quickly that will happen***, but that will happen."

## IX.    False and Misleading Statements in the August 16, 2023 CNBC Interview

127.   On August 16, 2023, Defendant Scherr participated in an interview on CNBC's Power Lunch with Phil Lebo and General Motors CEO Mary Barra (the "August 16, 2023 CNBC Interview"). When asked during the August 16, 2023 CNBC Interview, "what kind of demand are you seeing from Hertz customers when it comes to renting an electric vehicle?" Defendant Scherr falsely claimed Hertz was seeing EV demand in all areas—including leisure:

**[W]e're seeing demand in a number of areas of our business. First, we're seeing it in leisure. We're also seeing it in the corporate business where corporate customers of ours want to put their employees into electric vehicles to satisfy some of their own sustainability objectives**. And we're obviously renting electric vehicles to Uber, Lyft, and other ride share drivers with this turns out

to be a very profitable but venture both for us and for them, uh, where drivers can make considerably more money on a weekly basis, renting an electric vehicle. And we're just very excited to be engaged with GM and starting to take delivery on the 175,000 cars that we intend to buy.

128.   The above statements were materially false and misleading when made because EV demand was declining because customers did not want to rent EVs due to a lack of sufficient charging stations and because they did not know how to operate them or were dissatisfied with the driving experience of EVs. Thus, Hertz was not seeing demand in the EV leisure or the corporate space, as evidenced by:

a. CW1 stated that by Q2 2022, demand for EVs began to decline as customers did not want to use EVs because there were not enough charging stations and customers did not like the driving experience, and demand stayed suppressed through at least CW1's departure in the third quarter 2023;

b. CW1 recalled that EV utilization began declining around six months after they were introduced, or by Q2 2022, because customers did not want to rent EVs due to lack of charging stations and they did not like the driving experience. CW1 stated that utilization stayed down throughout CW1's tenure and EV utilization was about 20-25% less than ICE vehicle utilization, as would have been reflected in Tableau and CapGuard;

c. CW2 stated that, by the summer of 2022, demand for EVs across the leisure, corporate and government segments had not materialized in any of Hertz's markets due to a lack of charging stations and customers did not know how or like to drive EVs so that EVs were just sitting on the lot taking up space, requiring Hertz to lower its pricing, which still did not increase demand during CW2's tenure;

d. CW2 attended a site visit in the summer of 2022 as part of the "Extra Hands" annual initiative where CW2 personally observed "a bunch of Teslas" sitting in the lot experiencing low utilization;

e. CW2 stated that EV utilization was between 55% to 60% in CW2's Midwestern US region, as well as for 70% to 75% of the other regions in the country, and was at that level throughout CW2's employment and sometimes fell as low as 30% to 35% in CW2's region;

f. CW3 stated that EVs were not being rented during 2022 and 2023 as there were always a ton at the lot because customers did not want to rent EVs as they were unfamiliar with how to operate and charge them;

g. CW1's team was told throughout most of CW1's tenure to give customers an EV rental, even though they had requested an ICE vehicle, so Hertz could report that there were more EVs on the road. CW1 knows this because CW1 viewed the data in the Tableau system which reported, by location, which vehicles were actually reserved by customers versus what was on the road. CW1 recalled that this resulted in a lot of customer complaints, which CW1 learned from the Operations Manager CW1 spoke with multiple times per day;

h. Around February 2023, CW1's team was given a directive from Brady during the monthly Revenue Management All Hands meeting to increase rental prices on EVs to make up for lost revenue on EV rentals but the rate increase hurt overall EV utilization as customers did not want to pay the higher prices;

i. Defendants admitted they had to sell off 50% of Hertz's EV fleet to "tighten[] the EV supply" to "bring supply in line with natural demand that's being expressed" and "bring our fleet inside the demand curve;"

j. Defendants further admitted that, due to Hertz's EV supply in excess of demand, Hertz "realized lower utilization than what we really want to be at on the EV fleet that we have" and, thus, Hertz would be replacing half of its EVs, "which were producing lower

73

utilization" and "replacing that with an ICE car, which we believe
will run higher utilization on;" and

k.  Defendants admitted that Hertz's aggressive purchasing goal to have
    its fleet consist of 25% EVs by 2024 lacked any reasonable basis and,
    thus, Hertz was no longer "out to achieve a fixed percentage of our
    fleet being electric by date and time" as Defendants were "***ahead of
    ourselves in the context of how quickly that will happen***, but that
    will happen."

129.   When explicitly asked during the August 16, 2023 CNBC Interview
about whether Hertz was having trouble renting EVs due to a lack of charging
stations, Defendant Scherr assured investors that Hertz customers would not shy
away from renting EVs due to a lack of charging stations because, as demand
increased, "capital" to build more charging stations would follow:

> Lebo: Steven, speaking of adopting electric vehicles or being more
> exposed to them, um, one of the big concerns that I hear from people,
> whether they're renting from Hertz, whether they're driving an
> electric vehicle that they own, is public charging stations. JD Power
> out with a report today saying people are more dissatisfied than ever
> before when it comes to public charging stations. Um, *are you
> concerned that this is a limiting factor that might make people think
> twice before they rent an ev?*
>
> Scherr: **I wouldn't say I'm concerned so much as we're focused
> on it**. **I mean, we have about 3000 of our own proprietary
> chargers, which are meant to keep our fleet running**, but we're in
> partnership with BP, as you know, uh, **to help develop and roll out,
> uh, charging stations all across the country. … We obviously
> have locations in proximity to about 90% of the US population.
> We're putting those locations to work**. We obviously have the cars.
> We know where they're going, we know where they're dwelling, and
> we have an opportunity to grow this out. And we're partnering with
> cities all across the US as part of a Hertz electrifies program,
> Houston, Atlanta, Orlando, and we hope to announce others soon

Denver as well, all with an effort to sort of grow our charging stations. But I, I will tell you, having been an observer of the market for a long, long time, you know, **to the extent that we continue to see growth in ev sale rental utilization,** you can be assured that capital follows and we get inbounds all the time from infrastructure funds and other sources of capital to put against this opportunity. **And so I'm sure it will come as it is coming now.**

130.    The above statements were materially false and misleading when made because Hertz lacked sufficient charging stations to service its EV fleet, as evidenced by:

a.    The fact, according to CW1, by Q2 2022, demand for EVs began to decline as customers did not want to use EVs because there were not enough charging stations and demand stayed suppressed for this reason through at least CW1's departure in the third quarter 2023;

b.    CW1 recalled that EV utilization began declining around six months after they were introduced, or by Q2 2022, because customers did not want to rent EVs due to lack of charging stations. CW1 stated that utilization stayed down throughout CW1's tenure and EV utilization was about 20-25% less than ICE vehicle utilization, as would have been reflected in Tableau and CapGuard;

c.    CW2 stated that, by the summer of 2022, demand for EVs across the leisure, corporate and government segments had not materialized in any of Hertz's markets due to a lack of charging stations so that EVs were just sitting on the lot taking up space, requiring Hertz to lower its pricing, which still did not increase demand during CW2's tenure;

d.    CW1 recalled that even at Hertz's rental locations, it did not have sufficient (or sometimes any) charging stations and, thus, Hertz's own charging stations did not keep the EV fleet running;

e.    CW2 stated that, throughout CW2's employment, Hertz's locations did not have onsite charging stations regularly available, and approximately 30% of Hertz's locations received EVs before a proper charging infrastructure was put into place, including the St.

Louis location, which required the General Manger of that location
to have personnel take the EV offsite to find a charging station to
charge the EVs;

f.  CW2 stated that EV utilization was between 55% to 60% in CW2's
Midwestern US region, as well as for 70% to 75% of the other
regions in the country, and was at that level throughout CW2's
employment and sometimes fell as low as 30% to 35% in CW2's
region;

g.  CW3 stated that EVs were not being rented during 2022 and 2023
because there were always a ton at the lot because customers did not
want to rent EVs as they were unfamiliar with how to operate and
charge them.

### DEFENDANTS DISCLOSED THE TRUTH
### THROUGH SEVERAL DISCLOSURES

**I.    October 26, 2023 Disclosure**

131.   On October 26, 2023, Defendants held a call with analysts to discuss

Hertz's third quarter 2023 financial results ("Q3 2023 Earnings Call"). During the

Q3 2023 Earnings Call, Defendant Scherr admitted that Hertz "underperformed

in Q3 relative to our expectations and [Hertz] must correct the issues that weighed

on [its] results." Defendants attributed Hertz's poor results, in part, to a lack of

demand for EVs, particularly Tesla EVs, of which make up approximately 80%

of Hertz's EV fleet.

132.   According to Defendant Scherr, because Hertz experienced "higher

incidents of damage among EV rideshare drivers," the Company had moved EVs

from rideshare over to leisure. However, in doing this, without regard to demand,

Hertz caused the EV fleet in leisure to well exceed demand and RPD for EVs in leisure to drop. Thus, Scherr revealed that Hertz had to "tight[en] the EV supply in that channel and more accurately match[] the fleet to demand:"

> Our recent progress is reassuring as earlier in 2023 and occasion by higher incidents of damage among EV rideshare drivers, we took steps to moderate our rideshare growth and re-underwrite the rideshare driver base. This meant purposely slowing the supply of EVs into rideshare and moving more electric vehicles into the leisure channel to facilitate their ongoing utilization. With hindsight, ***this left leisure over fleeted with EVs. As a result, RPD for our electric vehicles in leisure drop***, which contributed to the lower RPD performance for the company in the quarter. As you would expect, we have been parsing the data on damage and actively remediating the causals.
>
> And during Q4, we are more confident in the quality of demand in rideshare, buffeted by enhanced processes to better underwrite drivers and to improve the mix of more experienced higher length of keep drivers. This is enabling us to return confidently to a strategy of growing the level of our existing electric fleet that is allocated to this business. Over the next several quarters, we expect to move an increasing number of our current electric vehicles into the rideshare fleet, supplementing the several thousand EV on rents made in just the last several months. ***As we pull these cars from leisure, we are simultaneously tightening the EV supply in that channel and more accurately matching the fleet to demand in effect seeking to reverse the issue that pressured the quarter and adhering to our ROA mentality***. We're also continuing to take steps to rectify the issue of elevated EV damage costs broadly, which we had thought would come down more quickly than they have.

133.    Defendant Scherr further disclosed that, going forward, due to a lack of demand and unprofitable margins, Hertz would purchase EVs at a much slower rate, marking 2023 now as a "transitional year" for Hertz as it worked "to fix" its

problems with the EV fleet and "improve the foundational elements" of that business:

> We know the challenges at hand and are working to remedy that, which we can. And we'll pace ourselves accordingly **with an expectation that our in-fleeting of EVs will be slower than our prior expectations**, but we will be stronger for having begun the journey when we did.

> Looking past our results in Q3, I want to close my remarks with a few comments about our expectations on the forward. 2023 has become a transitional year for the company, where we continue to fix and improve the foundational elements of the business from basic technology and field capability through to product offerings and brand strengthening.

134.    During the question-and-answer portion of the Q3 2023 Earnings Call, a Deutsche Bank analyst inquired whether the economics of the EVs would improve over time, to which Defendant Scherr admitted that, going forward, Hertz would "pace ourselves" and "watch what demand looks like" to avoid an imbalance of supply and demand like Hertz had experienced in 2023.

135.    When asked by an analyst from Oppenheimer & Co. regarding what percentage of the EVs was comprised of Teslas, Defendant Scherr revealed that EVs comprised about 11% of Hertz's total fleet, down from the 20-25% from the beginning of the year, of which Teslas represented 80%. Scherr also reaffirmed that, going forward, Hertz would be buying the majority of cars from General Motors at much lower price points.

136.    When asked by a Jefferies LLC analyst about whether moving Teslas into the leisure segment gave a bump in RPD, Scherr responded that moving EVs into leisure caused an imbalance in EV demand where there were more EVs in leisure than demand:

> So on the electric vehicles in leisure, I think **on the forward, our view is that we need to bring supply in line with natural demand that's being expressed**. And as we've always said, **we want to bring our fleet inside the demand curve**. **That same holds true in terms of electric vehicles in leisure**. And there are a number of sort of parts to the demand equation on the RAC side. Leisure, of course, being one where people have a natural desire and interest in driving an EV.

137.    Accordingly, Hertz walked back its goal of having 25% of its fleet be EVs by 2024, before abandoning it altogether:

> I think it's also important to say that I'm not out to achieve a fixed percentage of our fleet being electric by date and time, meaning much as we had initially targeted to get to 25% of our fleet being electric by the end of 2024.

138.    Upon the news, Hertz's stock price dropped from a closing price of $10.12 per share on October 25, 2023 to $9.04 per share on October 26, 2023 and continued to decline to $8.62 per share on October 27, 2023.

## II.    January 11, 2024 Disclosure

139.    On January 11, 2024, approximately three weeks in advance of its Q4 and full year 2023 earnings announcement, Defendants issued a press release and Form 8-K (the "January 11, 2024 Form 8-K") announcing Hertz would be

selling 20,000 EVs or one-third of its EV fleet,[3] and replacing them with ICE

vehicles to "better balance supply against expected demand of EVs:"

> Hertz Global Holdings, Inc. (the "Company" or "Hertz") has made
> the strategic decision to sell approximately 20,000 electric vehicles
> ("EVs") from its U.S. fleet, or about one-third of the global EV fleet.
> These vehicle dispositions, which were initiated in December 2023
> and are expected to take place in an orderly fashion over the course
> of 2024, will cover multiple makes and models. EVs held for sale
> will remain eligible for rental within the Company's fleet during the
> sales process. The Company expects to reinvest a portion of the
> proceeds from the sale of EVs into the purchase of internal
> combustion engine ("ICE") vehicles to meet customer demand.
>
> The Company's decision to reduce its EV fleet will result in the
> recognition, during the fourth quarter of 2023, of approximately $245
> million of incremental net depreciation expense related to the sale.
> This non-cash charge represents the write down of the EVs' carrying
> values as of December 31, 2023 to their fair values, less related
> expenses associated with the disposition of the vehicles. …
>
> The Company expects this action to better balance supply against
> expected demand of EVs. This will position the Company to
> eliminate a disproportionate number of lower margin rentals and
> reduce damage expense associated with EVs. …

140.    The January 11, 2024 Form 8-K further stated that Hertz would better

manage the size of its EV fleet and how it allocated them among business

segments:

> Going forward, the Company will continue to actively manage the

---

[3] Hertz's EV fleet as of January 2024 was, thus, approximately 60,000 EVs. According to
Hertz's 2023 Form 10-K for the period-ending December 31, 2023, Hertz reported Average
Vehicles in the Americas RAC segment for 2023 and 2021 of 446,219 and 355,647,
respectively. Thus, Hertz acquired approximately 90,572 vehicles in 2022 and 2023, combined,
and Hertz's 60,000 EV fleet acquisitions during that same two-year period represents
approximately 66% of the Company's overall vehicle purchases in 2022 and 2023.

total size of its EV fleet, as well as the allocation of EVs among
customer segments, including leisure, corporate, government and
rideshare. It is expected that the planned reduction in the EV fleet
and reinvestment in additional ICE vehicles will improve Adjusted
Corporate EBITDA across 2024, as vehicles are rotated, and in 2025,
by which time all of the vehicles included in this plan are expected
to be sold.

141.    Defendants also previewed for investors Hertz's negative financial

results due to substantial charges to depreciation and mark-to-market to reduce

the carrying values of EVs:

> The Company expects to report financial results for the fourth quarter
> ended December 31, 2023 on February 6, 2024. Consistent with
> expectations, the Company expects to report revenue for the fourth
> quarter of 2023 in the range of $2.1 billion to $2.2 billion, in line with
> historical seasonality relative to its third quarter. Adjusted Corporate
> EBITDA for the fourth quarter of 2023 will be negatively impacted
> by the incremental net depreciation expense associated with the EV
> sales plan, and further burdened by higher depreciation expense in
> the ordinary course as residual values for vehicles generally fell
> throughout the quarter greater than previously expected… The
> Company expects to report a negative Adjusted Corporate EBITDA
> (excluding the impact of the non-cash charge related to the EV sales
> plan) for the fourth quarter in the range of ($120 million) to ($130
> million).

142.    Also on January 11, 2024, Defendant Scherr participated in an

interview on CNBC's Squawk on the Street and stated the sale of 20,000 EVs was

a response "to the reality" of the actual demand for EVs, and admitted that

Defendants had been "ahead of ourselves" on demand for EVs as rentals:

> Scherr: Well, I think, look, we, we took a bold move and are making
> a, a strategic adjustment to our fleet to take 20,000 electric vehicles

[out of] the fleet. Uh, it's really to respond to the reality, which is we're trying to bring supply in line with demand…

Interviewer: That's interesting. That's different from demand or behavioral friction when someone comes to the counter. Because originally the case, the thinking was this will be a nice way to, for people to experiment. Did that happen or did it not?

Scherr: It did happen. And it is happening. It's just not happening at a level of demand that justifies us maintaining a fleet of this size at this moment in time. You know, Carl, the one thing I would say is that at some point the reality of EVs and Teslas being the best selling car will at some point render them the best rental car. It's not yet. *So we may have been ahead of ourselves in the context of how quickly that will happen*, but that will happen.

143.   Upon the news, Hertz's stock price declined from $9.35 per share on January 10, 2024 to $8.34 per share on January 12, 2024, or 11%, on approximately double the trading volume.

144.   On February 6, 2024, before market open, Hertz issued a press release attached to a Form 8-K filed with the SEC announcing the Company's fourth quarter financial results previously previewed on January 11, 2024 ("Q4 2023 Press Release"). Consistent with the January 11 release, Hertz reported in the Q4 2023 Press Release fourth quarter revenue of $2.2 billion and "Adjusted Corporate EBITDA of negative $382 million, a negative 17% margin, including recognition of $245 million of net depreciation expense related to the previously announced sale of electric vehicles ('EV')."

145.   On February 6, 2024, Defendants also held the fourth quarter earnings call ("Q4 2023 Earnings Call"). During the Q4 2023 February 6, 2024

Earnings Call, Defendant Scherr reiterated that, contrary to Defendants' prior statements that Hertz planned to have 25% of its fleet be comprised of EVs by the end of 2024, 2024 was now a "transitional year" for Hertz.

## III.    April 25, 2024 Disclosure

146.    On April 25, 2024, Defendants issued a press release announcing Hertz's first quarter 2024 results ("Q1 2024 Press Release"). Defendants revealed that vehicle depreciation increased in the quarter by $339 on a per-unit basis, $119 of which was related to declining residual values on EVs held for sale that Hertz had at high prices despite a lack of demand. Hertz also reported a $195 million charge to vehicle depreciation to write down EVs held for sale that were remaining in inventory at quarter-end to fair value and to recognize the disposition losses on EVs sold in the period because of overfleeting.

147.    On April 25, 2024, Defendants held a call with analysts to discuss Hertz's first quarter 2024 results ("Q1 2024 Earnings Call"). In discussing these results, on the Q1 2024 Earnings Call new CEO West recognized "upfront that this was a challenging quarter for Hertz." As West recognized, his primary focus would be on Hertz having the "right fleet:"

> As I'm settling into my new role, there are a number of key priorities I'm focused on. ***It starts with having the right fleet. So balancing short-term decisions with long-term implications to drive a better return on assets. This includes making sure that we have the right supply and demand balance of our fleet, at the appropriate capital cost.*** Decisions around our fleet are based on return on assets and the

discipline of fleeting inside the projected demand curve to ensure we achieve favorable revenue per day and revenue per unit performance, along with better managing our residual value risk.

148.    COO Justin Keppy revealed that Hertz would also be selling off 30,000 of its EVs, a one-third increase from its prior disclosure that the Company would be selling 20,000 EVs, in order to rid Hertz of excess EV inventory that came at a higher cost:

> Turning to EVs. We previously announced our plan to reduce the EV fleet by 20,000 units. And by the end of Q1, we sold about half of them. ***Given this progress, we increased the EV disposal plan by another 10,000 units, bringing the combined reduction to 30,000 vehicles, which we expect to complete by the end of the year. Upon completion, we anticipate that the remaining EV fleet will be better aligned with attractive demand for EVs*** with a priority on our rideshare business. Alex will discuss the impact of these sales during the financial overview.

149.    Defendants further revealed for the first time that, as a result of Hertz "overfleeting" its EVs, the Company had experienced lower and declining utilization on EVs during the Class Period. In response to a question from an analyst at Deutsche Bank, Darren Arrington, Hertz EVP of Revenue Management and Fleet Operations, admitted that Hertz needed to get supply better in line with demand and improve EV utilization, which had suffered due to a lack of demand:

> We also -- what I'd say on the fleet, you asked how do we get there? ***We're selling EVs***. Are we replacing them one for one? ***We're not replacing them one for one as we take them out of the fleet. We realized lower utilization than what we really want to be at on the EV fleet that we have***. And so as we think about the rotation of EVs out of the fleet, ***which were producing lower utilization and***

*replacing that with an ICE car, which we believe will run higher
utilization* on, we do not need to replace them one for one. We also
receive a cap cost benefit from doing that as the prevailing cost on
EVs are higher than what they would be on a replacement ICE car.

150.    Thus, Hertz's reckless EV buying spree in excess and at high vehicle

prices, without the corresponding demand, had a significant, negative impact on

Hertz's bottom line and utilization.

151.    When asked by an analyst at Oppenheimer & Co. about Hertz's plans

to change its strategy going forward, West responded that Hertz needed to work

on lining up EV supply with demand and in the right segments—something it

failed to do during the Class Period:

> But then we also need to continue to work on the demand side of that
> and improve our product market fit. So we're -- as Darren alluded to,
> we've got to optimize our EV allocations really into the right
> segments. So we're fortunate, and we'll optimize those in terms of
> ride-hail business, off airport operations, and then airport, really in
> that order. ***And then we've got to continue to optimize our fleet mix
> more in line with the core customer demand as we rotate out the
> fleet***. …

152.    Upon the news, Hertz's stock price fell $1.12 per share, or 19.31%,

to close at $4.68 per share on April 25, 2024.

**POST CLASS PERIOD EVENTS**

153.    On June 3, 2024, Hertz announced the appointment of Scott M.

Haralson as Chief Financial Officer, to replace Alexandra Brooks, who was

purportedly "leaving the Company to pursue other opportunities but will remain until the end of the month to ensure an orderly transition."

154.   On June 20, 2024 Hertz announced in a press release ("the June 20, 2024 Press Release") that its wholly-owned indirect subsidiary, The Hertz Corporation, would be offering $500 million in aggregate principal amount of First Lien Senior Secured Notes due 2029 and $250 million in aggregate principal amount of Exchangeable Senior Second-Lien Secured PIK Notes due 2029 in private offerings. According to the June 20, 2024 Press Release, "Hertz Corp. intends to use the net proceeds of the offerings to pay down a portion of its $2.0 billion committed revolving credit facility" to improve liquidity. The following day, Hertz announced Hertz Corp. would be increasing its total offering to $1 billion.

155.   On July 8, 2024, Hertz announced purported "key appointments that will strengthen its leadership team and sharpen the Company's focus on driving enhanced profitability through operational excellence, superior customer service, strategic fleet management, cost control, and premium revenue." According to the release:

> Sandeep Dube will join Hertz as Executive Vice President, Chief Commercial Officer on July 22, 2024, and Katherine Lee Martin, who currently serves as Hertz's Interim General Counsel, will be appointed to Executive Vice President, General Counsel, and Corporate Secretary, effective immediately.

In addition, the following leaders are joining Hertz this month: Henry Kuykendall as Executive Vice President, North America Operations; Greg May as Executive Vice President, Fleet Management; and Mike Moore as Executive Vice President, Technical Operations. Each executive will report to Hertz Chief Executive Officer Gil West.

156.  According to CEO West during an August 1, 2024 Earnings Call after the Class Period, Hertz had reduced its EV fleet to less than 10% of the Company's overall fleet, admittedly because the demand simply was not there. West further stated that, going forward, Hertz would, instead, look to make sure its fleet matched demand, stating: "in terms of how our EV fleet looks going forward, the ins and out of that, ins and outs of that, then we'll just look to ensure that our fleet matches that natural demand and adjust accordingly in that -- that will just be a normal course of business for us going forward."

## ADDITIONAL SCIENTER ALLEGATIONS

157.  Numerous facts alleged herein support a strong inference that Defendants knew or recklessly disregarded that the statements set forth above were materially false and misleading when made. The below facts further solidify the inference of scienter as to each defendant. The scienter of the Individual Defendants and other senior executives is properly imputed to Hertz.

I.    **Electric Vehicles Were a Substantial Piece of Hertz's Growth Plan to "Lead the Way" to Become "the Largest EV Rental Fleet in North America"**

158.   In the latter part of 2021, Hertz announced its plan to become the largest rental company for EVs. Defendants told investors that Hertz was pursuing a very aggressive growth plan for its EV fleet such that by the end of 2024, EVs would comprise 25% of Hertz's overall fleet.

159.   Indeed, according to then interim CEO Mark Fields in an October 25, 2021 press release, "[t]he new Hertz is going to lead the way as a mobility company, starting with the largest EV rental fleet in North America and a commitment to grow our EV fleet and provide the best rental and recharging experience for leisure and business customers around the world."

160.   According to Defendant Scherr during an April 4, 2022 interview with Bloomberg, Hertz was "looking to build out, uh, the largest electric fleet in North America" and Defendants' plan was to position Hertz to "diversify the fleet and really meet what, uh, our customers are looking for. Whether they're individuals, corporates who are looking to fulfill their own carbon footprint objectives, and then fleets like Uber who want to put their, uh, riders into, uh, into EVs."

161.   CW1 and CW2 confirmed that Defendants had a very large focus on EV growth, utilization and profitability throughout CW1's tenure. According to

CW1 and CW2, Defendants discussed the status of the EV fleet, including the number of EVs acquired, at every quarterly Global Townhall meeting.

162.   CW2 also stated that at the Company-wide, quarterly Global Townhalls Defendant Scherr addressed employees in the cafeteria of the Hertz headquarters in Florida and the general message regarding EVs was that they were "a great initiative" for the Company.

163.   Thus, as Defendants were laser focused on the acquisition, demand and utilization of Hertz's EV fleet prior to and throughout the Class Period, they would have apprised themselves about all aspects concerning Hertz's EV fleet, including demand, utilization and revenue.

## II.    Defendants' Admissions that Hertz Did Not Manage Its Fleet In Accordance with Demand

164.   Defendants' own admissions that they recklessly purchased EVs without regard to demand to achieve Hertz's goal of having 25% of its fleet comprised of EVs creates a strong inference of scienter. Indeed, Defendants admitted at the end of the Class Period that they had to sell off 50% of Hertz's EV fleet to "tighten[] the EV supply" to "bring supply in line with natural demand that's being expressed" and "bring our fleet inside the demand curve." Furthermore, Defendants admitted that they purposely slowed the supply of EVs into Ride Share because of higher incidents of damage among EV rideshare

drivers, and moved electric vehicles into the leisure channel, which "left leisure over fleeted with EVs."

165.    Defendants further admitted that, due to Hertz's EV supply in excess of demand, EV utilization was too low and, thus, Hertz would be replacing its excess EVs with ICE vehicles, stating "*[w]e're not replacing [EVs] one for one as we take them out of the fleet. We realized lower utilization than what we really want to be at on the EV fleet that we have*. And so as we think about the rotation of EVs out of the fleet, *which were producing lower utilization and replacing that with an ICE car, which we believe will run higher utilization* on."

166.    Accordingly, Defendants admitted that Hertz's aggressive purchasing of EVs so that 25% of its fleet would consist of EVs by 2024 lacked any reasonable basis and, thus, Hertz was no longer "out to achieve a fixed percentage of our fleet being electric by date and time." Indeed, as Defendant Scherr conceded, "I would say is that at some point the reality of EVs and Teslas being the best selling car will at some point render them the best rental car. It's not yet. So *we may have been ahead of ourselves in the context of how quickly that will happen*, but that will happen."

### III.    Defendants Knew Hertz Was Not Seeing Demand for EVs from Internal Company Reports Tracking Such Data

167.    Defendants would have known from Hertz's internal systems used to monitor fleet composition, performance, demand, utilization and revenue that EV demand and utilization were declining and depressed throughout the Class Period.

168.    According to CW1 and CW2, the Tableau system provided real-time data for Hertz's entire fleet down to a very granular level such as the car type and features and utilization of each car, as well as higher level reports such as utilization for EVs versus ICE vehicles and the fleet as a whole by region or Companywide. Tableau also reported on metrics such as vehicle demand (rentals versus available inventory), utilization, Revenue Per Day (RPD) and rates charged for rentals. CW1 stated that the executives, including the CEO and CFO, would have had access to Tableau during the Class Period, which would have showed that, by early to mid-2022, demand for EVs and EV utilization was declining and that there were far more EVs than demand for them throughout at least CW1's tenure, resulting in lower EV utilization.

169.    CW2 also confirmed that Hertz's senior executives had complete access to Tableau and through Tableau, could see all of the KPIs and other data.

170.    According to CW1, Hertz also used the CapGuard system to review reservations and available vehicles from the fleet and utilization of the fleet. CW1 recalled that Hertz's revenue analysts ran reports from CapGuard regarding

vehicle utilization and other metrics and provided them to managers, directors and VPs.

171.    CW2 generated "CapGuard" reports that were forwarded to the manager, and other General Managers in the field.  CW2 stated that dos Santos insisted that the data in CapGuard was correct so dos Santos could generate CapGuard reports to circulate to Hertz's leadership. KPIs in the reports were detailed down to the car level, pool-level, region-level, as well as revenue-per-unit, revenue per day, utilization, and revenue per transaction (which included revenues from ancillary value-added services that Hertz offered).

172.    Thus, Defendants also had access to, and likely received, reports on Hertz's EV fleet performance from CapGuard, which would have provided similar negative data on EV demand and utilization as in Tableau by mid-2022.

173.    In connection with the monthly Revenue Management All Hands meetings, CW1 recalled that slide decks were prepared containing information on Hertz's KPIs, such as utilization, cars on road, rates and revenue numbers. These slide decks were saved in a Company shared folder that was accessible to the "higher ups", including the executives. CW1 and CW2 stated that the slide decks were also emailed out to participants and management. Like the reports in Tableau and CapGuard, the slide decks provided at the monthly regional revenue management meetings showed EV demand was declining by mid-2022.

174.   Defendants admit they monitored this data. Indeed, according to Defendant Scherr during the April 4, 2022 Bloomberg Interview, Defendants closely monitored internal data concerning demand for Hertz's fleet:

> [A] lot of what mobility is going to be driven off of is data. We sit on a lot of it. We know where cars are going, we know where people are going. We know where things are going. And so there's an a real opportunity for Hertz to kind of take the hill, if you will, in the context of how mobility is gonna play out.

175.   CEO West echoed those comments in an August 1, 2024 Earnings Call, stating "we certainly see the booking patterns of our customers. We, of course, measure their desires in terms of fleet preferences."

176.   Thus, Defendants admittedly tracked and reviewed the data regarding EV fleet demand, utilization, revenue and profitability on at least a monthly and quarterly basis and, thus, would have known EV demand was declining and that EV demand and utilization stayed depressed throughout the Class Period.

## IV.    Defendants Knew Hertz Was Not Seeing Demand for EVs from Internal Company Meetings

177.   CW1 and CW2 also attended quarterly Global Townhall meetings with Defendants in Hertz's cafeteria at its corporate headquarters in Estero, Florida held the same days that Hertz released its quarterly earnings to the market. According to CW1, everyone at the Company could attend and participate either in person or over video.

178. CW1 recalled that, during the Global Townhall meetings, Defendants always discussed the status and profitability of Hertz's EV fleet given its import to the Company. CW1 recalled that the CEO and CFO gave a presentation put up on a large screen that provided financial figures as well as information specifically on Hertz's EV fleet, such as utilization that quarter.

179. Defendants presumably informed themselves about the subjects upon which they presented prior to the meetings and, thus, knew EV demand and utilization had declined and stayed down.

180. Moreover, according to CW2, that there was "no utilization" of the EVs and the EVS were just "sitting on the lots" was raised at monthly Revenue Management All Hands meetings which all of the VPs and Senior Managers in Revenue Management attended, including Arrington, who reported to Defendant Scherr.

181. Further, CW3 confirmed that CW3's manager, Andre LaRosa, provided the Individual Defendants and, in particular, CEO Scherr, with monthly reports on EV sales from at least April 2023 to the end of 2023, which showed EVs were listed as available-for-sale because Hertz's EV fleet exceeded demand, and that Hertz was struggling to sell EVs because its sale prices were too high.

182. Thus, Defendants' attendance at internal Company meetings supports scienter.

**V.    Defendants Knew the Carrying Values for Hertz's EV Fleet Were
Overstated Because Hertz Was Unable to Sell the EVs at the Higher
Book Values**

183.    As discussed above, to grow Hertz's fleet as quickly as possible and
be a first mover in the EV rental market, Defendants paid top dollar to acquire
Tesla EVs to build out its fleet.

184.    However, as CW3 confirmed, within a little over one year after
introducing EVs into Hertz's rental fleet, Defendants were forced to begin selling
them due to a lack of demand. CW3 confirmed that Hertz began selling EVs in
April 2023 and the rate of EVs available for sale increased throughout 2023 and
into 2024. CW3 also confirmed that Hertz's resale prices were too high and, thus,
dealers were not willing to buy them at Hertz's inflated prices.

185.    Defendants were aware that Hertz was attempting to sell off its EVs
starting in the second quarter of 2023 and that the EVs were not selling at the
higher prices from April 2023 forward, from the Excel spreadsheets on Hertz's
internal server to which they had access, as well as from monthly meetings with
CW3's manager, Andre LaRosa, and other managers and VPs during which
Defendants discussed the status and profitability of EV sales. CW3 was aware of
these meetings because CW3's manager told this witness about them and CW3
understood materials CW3 discussed with LaRosa were used in preparation for
LaRosa's monthly meetings with Defendants.

## VI.    Suspiciously Timed Turnover in Hertz's Senior Management Supports Scienter

186.    During and shortly after the Class Period, Hertz experienced significant executive turnover, including the following:

- <u>March 27, 2023</u>: Kenny Cheung abruptly resigned and was replaced by Alexandra Brooks, Hertz's then Chief Accounting Officer, as interim Chief Financial Officer effective April 1, 2023, at the same time Defendants began raising EV prices due to lack of demand.

- <u>September 13, 2023</u>: Paul Stone, COO and President, abruptly resigned with no explanation, effective September 30, 2023, just two weeks before the third quarter 2023 end in which Hertz reported disappointing results below expectations due, in part, to lack of EV demand.

- <u>January 15, 2024</u>: Jeffrey Nedelman in explicably resigned from the Board of Directors effective as January 19, 2024, just four days after Hertz announced preliminarily, its fourth quarter 2023 results and that the Company would be selling off 20,000 EVs or one-third of its EV fleet.

- <u>March 15, 2024</u>: Shortly after Hertz announced the massive sell-off of one-third of its EV fleet, the Company announced

that Defendant Scherr was stepping down as CEO and being

replaced by Wayne Gilbert West, effective April 1, 2024.

- June 3, 2024: Alexandra Brooks resigned from her CFO

  position and was replaced by Scott M. Haralson, shortly after

  Hertz announced negative first quarter 2024 financial results

  wherein Defendants disclosed Hertz would be selling off an

  additional 10,000 EVs, bringing the total to 30,000 EVs.

187.   The numerous executive departures at suspicious times supports

scienter.

## VII.   Defendants Were Motivated to Issue False Statements to Ensure Hertz Did Not Violate Its Debt Covenants and to Obtain Badly Needed Funding to Refresh its Aging Fleet

188.   As Hertz rushed to become a "first mover" in the EV rental market,

Defendants paid top dollar to quickly acquire an EV fleet comprised of mainly

Tesla EVs using cash obtained from increasing Hertz's debt load. Hertz's debt

agreements had several financial debt covenants such as the leverage ratio that,

among others, required the Company to maintain certain EBITDA levels.

189.   In January 2023, Tesla decreased the prices for certain EV models

by at least 20% to boost sales. Accordingly, the residual prices for Hertz's EV

fleet, likewise declined. Defendants, however, did not record a charge against

earnings at that time to reflect the decline in value. Even after CW3's manager

would have informed Defendants starting in April 2023 that the value of Hertz's available for sale EVs was too high, Defendants did not record a charge against earnings.

190.    Rather, Defendants were motivated to misrepresent the demand for Hertz's EV fleet as being strong across all segments with its fleet size and composition being within the confines of demand to avoid any charges against earnings that would negatively affect EBITDA and violate debt covenants, thereby throwing the Company into its second bankruptcy in the last five years. This also allowed Hertz to raise capital to replace the EVs that nobody wanted with ICE vehicles.

191.    It was not until the end of the fourth quarter 2023 that Hertz was forced to start selling off what would end up being one-half of the EV fleet due to lack of demand, that Hertz announced two massive write-downs—one in February 2024 and one in April 2024.

192.    On June 20, 2024, Hertz announced it intended to offer junk bonds to improve the balance sheet and finance its vehicle refresh. After upsizing the offering to $1 billion in the aggregate on June 21, 2024, Hertz received $1 billion in proceeds from offering $750 million in aggregate principal amount of First Lien Senior Secured Notes due 2029 and $250 million in aggregate principal amount of Exchangeable Senior Second-Lien Secured PIK Notes due 2029. Defendants

stated that the proceeds from the offering would be used to pay down a portion of

Hertz's $2.0 billion committed revolving credit facility and to finance its fleet

refresh.

193.   As CFO Scott Haralson stated in an August 1, 2024 earnings call:

The good news is that we believe we have plenty of liquidity to
handle this. With our recent capital raise, we have bolstered liquidity
to a place where we are comfortable that we can complete the
transformation, even if residuals decline at a faster rate than we have
conservatively forecasted.

194.   Thus, Defendants were motivated to misrepresent EV demand to

meet debt covenants and enable Hertz to raise badly needed capital to refresh the

fleet and pay down $2 billion of its credit line.

## VIII.   Scherr's Executive Compensation Agreement Motivated Him to Artificially Inflate Hertz's Stock Price

195.   Defendant Scherr was motivated to artificially inflate Hertz's stock

price because his compensation package was heavily weighted towards Hertz's

stock price. Defendant Scherr's Employment Agreement, entered into on

February 3, 2022, provided him with a base salary of $1.5 million and the right to

participate in the Company's annual incentive program, with a target annual

incentive equal to 160% of his base salary. However, in lieu of participation in the

Company's long-term incentive program Scherr, instead, received three equity

grants that aggregated into the opportunity to earn shares representing 2% of the

Company's fully diluted shares. These performance-based awards were designed to directly link Scherr's compensation to Hertz's stock price.

196.   At the heart of Scherr's sign-on package, representing more than 50% of his total sign-on awards, were 6,539,378 performance-based restricted stock units (1.05% of fully diluted shares of the company's common stock). The awards, once earned based on the stock price, vest in 20% increments annually through December 31, 2026, and are paid-out subject to a time-based vesting schedule that approximates 20% increments over five years. Scherr earned the shares associated with the first 20% of those shares vested on December 31, 2022. The balance of these earned shares will vest ratably across December 31, 2023, 2024, 2025 and 2026.

197.   Indeed, a February 4, 2022 Financial Times article stated Scherr was awarded a total of 12.5mn Hertz shares in his new role as CEO and stands to make at least $250 million depending on how Hertz's stock performs. According to the article, "[i]f that **windfall** materializes, Scherr, who was once considered a potential candidate to lead Goldman Sachs as chief executive before he left the bank last year, may see his pay exceed that of the investment bank's current leader, David Solomon."

198.   Thus, Scherr was highly motivated to issue false statements to inflate Hertz's stock price.

## LOSS CAUSATION

199.   During the Class Period, as detailed herein, Defendants engaged in a
scheme to deceive the market and a course of conduct that artificially inflated the
price of Hertz common stock and operated as a fraud or deceit on Class Period
purchasers of Hertz stock by failing to disclose and misrepresenting the adverse
facts detailed herein. When Defendants' prior misrepresentations and fraudulent
conduct were revealed to the market, the price of Hertz common stock declined
as the prior artificial inflation came out of the stock's price.  The decline in the
price of Hertz common stock was the direct result of the nature and extent of
Defendants' fraud being revealed to investors and the market. Plaintiff and other
Class members purchased Hertz common stock at artificially inflated prices,
causing them to suffer damages as complained of herein.

200.   By misrepresenting the adverse facts detailed herein to investors,
Defendants presented a misleading picture of Hertz's business, risks, and future
financial prospects. As a result of their purchases of Hertz common stock during
the Class Period, Plaintiff and the other Class members suffered economic loss
(*i.e.*, damages) under the federal securities laws. Defendants' false and misleading
statements had the intended effect and caused Hertz common stock to trade at
artificially inflated levels throughout the Class Period, trading as high as $19.94
per share on February 16, 2023.

201.    The decline in the price of Hertz common stock after the corrective disclosures came to light was a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price decline in Hertz common stock negates any inference that the losses suffered by Plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

202.    Specifically, on October 26, 2023, Defendant Scherr admitted that Hertz "underperformed in Q3 relative to our expectations" due, in part, to a lack of demand for EVs, particularly Tesla EVs of which make approximately 80% of Hertz's EV fleet. Scherr further revealed that Hertz had to "tight[en] the EV supply in that channel and more accurately match[] the fleet to demand" and, thus, Hertz would purchase EVs at a much slower rate, marking 2023 now as a "transitional year" for Hertz as it worked "to fix" its problems with the EV fleet and "improve the foundational elements" of that business. Accordingly, Hertz abandoned its goal of having 25% of its fleet be EVs by 2024.

203.    These disclosures corrected Defendants' prior misstatements that, among others, "EV rental demand is very strong and strong across all aspects of our business," that Hertz "always" kept "fleeting within the confines of demand," and that "demand is not lessening at all."

204.   Upon the news, Hertz's stock price dropped from a closing price of $10.12 per share on October 25, 2023 to $9.04 per share on October 26, 2023 and continued to decline to $8.62 per share on October 27, 2023.

205.   Analysts understood Defendants' statements to be correcting their prior statements about EV demand. In an October 26, 2023 Credit Research report, J.P. Morgan maintained its underweight rating citing, in part, "the company's challenges with its electric vehicle strategy." J.P. Morgan further stated that margins were compressed because of "negative impacts due to oversupply of EVs from rideshare fleet to the leisure fleet."

206.   On January 11, 2024, Defendants issued a press release announcing for the first time that Hertz would be selling 20,000 EVs or one-third of its EV fleet, and replacing them with ICE vehicles to "better balance supply against expected demand" of EVs. Defendant Scherr admitted in the January 11, 2024 CNBC Interview, that "we may have been ahead of ourselves" with respect to the demand for EV rentals.

207.   This disclosure corrected Defendants' prior misstatements that, among others, Hertz was "committed" to keep "fleet [] inside expected demand" and there was "continued growth in demand across our customer segments."

208.   Upon the news, Hertz's stock price declined from $9.35 per share on January 10, 2024 to $8.34 per share on January 12, 2024, or 11%, on approximately double the trading volume.

209.   Analysts understood that Defendants' decision to sell 20,000 EVs was recognition that there was not enough demand for EVs and Hertz did not have enough charging stations to service the EVs. As a result, they had to sell EVs to keep their fleet size within the demand curve.

210.   Indeed, in response to the news, on January 12, 2024, Deutsche Bank understood Hertz' announcement that "it is effectively right-sizing its EV fleet (which consists mostly of Tesla models) to better align with current demand." Deutsche Bank further stated there was a "growing expectation in the market that HTZ would potentially reevaluate its EV strategy in light of numerous challenges associated with renting the vehicles (*charging infrastructure and in some cases driver unfamiliarity with acceleration/braking on Tesla models*) and Thursday's news confirms that HTZ saw a need to take action." With respect to Hertz's anticipated $120 to $130 million EBITDA loss in 4Q23, Deutsche Bank felt that it was "pretty clear that HTZ's EV fleet (both the 20k held for sale and the 40k that are remaining in the fleet) is the primary driver of the shortfall…" In other words, Deutsche Bank found that "*the company is taking what we think is widely viewed to be a necessary course correction on the EV fleet*."

211.   Additionally, in a January 11, 2024 report Oppenheimer acknowledged Hertz's decision to sell "~20K EVs (~1/3rd of its total EV fleet) over the course of 2024" as "consistent with the company's strategy to bring its EV fleet size inside the demand curve…"

212.   On April 25, 2024, Defendants revealed in the Q1 2024 Press Release that vehicle depreciation increased in the quarter by $339 on a per-unit basis, of which $119 was related to declining residual values on EVs held for sale that Hertz had purchased at high prices despite a lack of demand. Hertz also reported a $195 million charge to vehicle depreciation to write down EVs held for sale that were remaining in inventory at quarter-end to fair value and to recognize the disposition losses on EVs sold in the period because of overfleeting.

213.   On the Q1 2024 Earnings Call, Defendant Brooks revealed for the first time that as a result of "overfleeting in the quarter, utilization was down 120 basis points year-over-year." COO Justin Keppy also revealed for the first time that Hertz had overfleeted its EVs by much more than previously represented and, thus, Hertz would also be selling off an additional 10,000 EVs, or a one-third increase from its prior disclosure that the Company would be selling 20,000 EVs, in order to rid Hertz of excess EV inventory that came at a higher cost. Defendants further revealed for the first time that, as a result of Hertz "overfleeting" its EVs, the Company had experienced lower and declining utilization on EVs during the

105

Class Period, with Arrington stating, "[w]e're not replacing them one for one as we take them out of the fleet. We realized lower utilization than what we really want to be at on the EV fleet that we have."

214.  These disclosures corrected Defendants' prior misstatements that, among others, Hertz was able to "calibrate the fleet" and "maintain very high levels of utilization," as promised.  As a result, Hertz had to sell excess EV inventory at a loss.

215.  Upon the news, Hertz's stock price fell $1.12 per share, or 19.31%, to close at $4.68 per share on April 25, 2024.

216.  Analysts understood Defendants' disclosure to be a correction of Defendants' prior misstatements about EV demand. Indeed, in response to the news, on April 26, 2024, J.P. Morgan lowered its estimates and price target for Hertz "primarily on account of continued headwinds stemming from its (in retrospect) disastrous decision to purchase upward of 100,000 Teslas…" J.P. Morgan analysts understood that the Teslas caused several problems, including a softer RPD "as a result of having more EVs in its fleet than customers demanded…" Furthermore, J.P. Morgan analysts commented that "[a]ll in all, we would not be surprised if Hertz's decision to partner with Tesla ends up costing the company close to $1 bn."

217. Additionally, Deutsche Bank issued a report on April 29, 2024, stating that Hertz now planned to sell 10,000 more EVs than previously represented and that Hertz's EVs would now primarily service the rideshare business, while Hertz replaced EVs in leisure with ICE vehicles:

> On EVs, HTZ sold about 10k in 1Q (of the original 20k announced for sale) and has added another 10k to the planned disposition line, which means by year end HTZ should have sold 30k EVs. ***The EVs that remain in the fleet are expected to primarily service the rideshare fleet***. …

218. The economic loss (*i.e.*, damages) suffered by Plaintiff and the other Class members described above was the direct result of Defendants' fraudulent scheme to artificially inflate the price of Hertz common stock and the subsequent significant declines in the value of Hertz common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

**PRESUMPTION OF RELIANCE**

219. Plaintiff is entitled to a presumption of reliance under the fraud-on-the-market doctrine. As alleged herein, Defendants publicly issued a series of misleading and material misrepresentations throughout the Class Period. At all relevant times, the market for the Company's common stock was an efficient market that promptly digested current information related to the Company from all publicly available sources and reflected such information in the prices of the Company's common stock, by virtue of the following non-exhaustive factors:

1. Hertz met the requirements for listing and was actively listed on the NASDAQ throughout the class period;

2. Hertz filed periodic public reports with the SEC;

3. Hertz was followed by at least dozens of analysts and media;

4. Defendants regularly communicated with public investors via established market communication mechanisms, including regularly disseminated press releases on the national circuits of major newswire services;

5. Hertz stock traded at an average daily volume of 3.98 million shares during the Class Period;

6. Hertz's stock price reached a Class Period high of $19.94 per share on February 16, 2023 for market capitalization of approximately $6.4 billion; and

7. Hertz had between 305 million and 322 million shares outstanding at all times during the Class Period.

220.  As a result of the foregoing, the market for Hertz stock price promptly integrated current information related to the Company from all publicly available sources and reflected such information in the prices of the Company's common stock.  Under such circumstances, the presumption of reliance available under the "fraud-on-the market" theory applies.  Thus, Class members are

presumed to have indirectly relied upon the misrepresentations and omissions for which Defendants are each responsible.

221.    Plaintiff and other Class members justifiably relied on the integrity of the market price for the Company's common stock and were substantially damaged as a direct and proximate result of their purchases of Hertz common stock at artificially inflated prices and the subsequent decline in the price of those shares of common stock when the truth was disclosed.

222.    Plaintiff and the other Class Members are also entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because claims asserted in this complaint against the 10(b) Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

223.    Had Plaintiff and other members of the Class known of the material adverse information not disclosed by Defendants or been aware of the truth behind Defendants' material misstatements, they would not have purchased Hertz common stock at artificially inflated prices.

**NO SAFE HARBOR**

224.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements

pleaded in this complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

225.   In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

226.   In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of the Company who knew that the statement was false when made.

## CLASS ALLEGATIONS

227.   Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil procedure on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired common stock of Hertz Global Holdings, Inc., between January 6, 2023 and April 24, 2024, inclusive, and were injured thereby. Excluded from the Class

are: (a) Defendants; (b) members of the immediate families of Defendants; (c) the subsidiaries and affiliates of Defendants; (d) any person who is an officer, director or controlling person of Hertz; (e) any entity in which any Defendant has a controlling interest; (f) Defendants' directors' and officers' liability insurance carriers, and any affiliates or subsidiaries thereof; and (g) the legal representatives, heirs, successors or assigns of any such excluded party.

228.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are thousands of members in the proposed Class.  Indeed, as of February 12, 2024, Hertz had approximately 305 million shares of common stock outstanding.

229.    Members of the Class may be identified from records maintained by Hertz or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

230.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class, including:

  a) whether the federal securities laws were violated by Defendants' respective acts as alleged herein;

b) whether the statements made were materially false or misleading, or omitted material facts;

c) whether Defendants acted knowingly or with deliberate recklessness in issuing false and misleading financial statements;

d) whether the price of Hertz's common stock during the Class Period was artificially inflated because of Defendants' conduct complained of herein; and

e) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

231.   Plaintiff's claims are typical of the claims of other members of the Class and the other members of the Class sustained damages arising out of Defendants' wrongful conduct in violation of federal law as alleged in this complaint.

232.   Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions and securities litigation.  Plaintiff has no interests antagonistic to, or in conflict with, those of the Class.

233.   A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable.  Furthermore, because the damages suffered by the individual

Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

234.   Plaintiff will rely, at least in part, on the presumption of reliance established by the fraud-on-the-market doctrine. All purchasers of Hertz stock during the Class Period suffered similar injuries, including injury through their purchase of the stock at artificially inflated prices. A presumption of reliance therefore applies.

## COUNTS

### I.    Count I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

235.   Plaintiff restates and realleges each allegation as fully set forth herein.

236.   This claim is brought under §10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against all Defendants.

237.   Defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices

and a course of business which operated as a fraud and deceit upon Plaintiff and
the Class, in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated
thereunder.

238.   Defendants individually and in concert, directly and indirectly, by
the use, means, or instrumentalities of interstate commerce and/or the mails,
engaged and participated in a continuous course of conduct to conceal non-public,
adverse material information about the Company's outlook and condition, as
reflected in the misrepresentations and omissions set forth above.

239.   Defendants acted with scienter in that they knew that the public
documents and statements issued or disseminated in the name of the Company
were materially false and misleading, knew that such statements or documents
would be issued or disseminated to the investing public, and knowingly and
substantially participated or acquiesced in the issuance or dissemination of such
statements or documents as primary violations of the securities laws. Defendants
by virtue of their receipt of information reflecting the true facts of the Company,
their control over, and/or receipt and/or modification of the Company's allegedly
materially misleading statements, and/or their associations with the Company
which made them privy to confidential proprietary information concerning the
Company, participated in the fraudulent scheme alleged herein.

II.   **Count II**

**For Violations of Section 20(a) of the Exchange Act**

**Against the Individual Defendants**

240.   Plaintiff restates and realleges each allegation as fully set forth herein.

241.   This claim is brought under §20(a) of the Exchange Act, 15 U.S.C. § 78t, against the Individual Defendants.

242.   The Individual Defendants, by reason of their status as senior executive officers of Hertz, directly or indirectly controlled the conduct of the Company's business and its representations to Plaintiff and the Class, within the meaning of §20(a) of the Exchange Act.

243.   The Individual Defendants directly or indirectly controlled the content of the Company's SEC statements and press releases related to Plaintiff's and the Class's investments in Hertz common stock within the meaning of §20(a) of the Exchange Act. Therefore, the Individual Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

244.   The Individual Defendants controlled and had the authority to control the content of the Company's SEC statements and press releases. Because of their close involvement in the everyday activities of the Company, and because of their wide-ranging supervisory authority, the Individual Defendants reviewed or had

the opportunity to review these documents prior to their issuance or could have prevented their issuance or caused them to be corrected.

245.   The Individual Defendants knew or recklessly disregarded the fact that Hertz's representations were materially false and misleading and/or omitted material facts when made. In so doing, the Individual Defendants did not act in good faith.

246.   By virtue of their high-level positions and their participation in and awareness of Hertz's operations and public statements, the Individual Defendants were able to and did influence and control Hertz's decision-making, including controlling the content and dissemination of the documents and statements that Plaintiff and the Class contend contained materially false and misleading information and on which Plaintiff and the Class relied.

247.   The Individual Defendants had the power to control or influence the statements made, giving rise to the securities violations alleged herein, as set forth more fully above.

248.   As set forth herein, the Individual Defendants each violated §10(b) of the Exchange Act and Rule 10b-5, thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are also liable pursuant to §20(a) of the Exchange Act. As a direct and

proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the Class suffered damages in connection with their purchase of Hertz common stock.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.      Declaring that this action is properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as Class Representative and Lead Counsel as Class Counsel;

B.      Awarding Plaintiff and each Class damages;

C.      Awarding Plaintiff and each Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs;

D.      Granting Plaintiff leave to amend the complaint to conform to the evidence; and

E.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff and the Class demand a trial by jury.

Dated: September 30, 2024            Respectfully submitted,

                                     By:    *s/Cullin Avram O'Brien*
                                     Cullin Avram O'Brien
                                     **CULLIN O'BRIEN LAW, P.A.**

6541 NE 21st Way
Ft. Lauderdale, FL 33308
Tel: (561) 676-6370
Email: cullin@cullinobrienlaw.com

*Liaison Counsel for Plaintiff and the Class*

Shannon L. Hopkins (*pro hac vice*)
Gregory M. Potrepka (*pro hac vice*)
Amanda D. Foley  (*pro hac vice*)
**LEVI & KORSINSKY, LLP**
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel: (212) 992-4523
Fax: (212) 363-7171
Email: shopkins@zlk.com
Email: gpotrepka@zlk.com
Email: afoley@zlk.com

*Lead Counsel for Plaintiff and the Class*

118