## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FT. MEYERS DIVISION

EDWARD M. DOLLER, Individually
and on Behalf of All Others Similarly
Situated,

          Plaintiff,

v.

HERTZ GLOBAL HOLDINGS, INC.,
STEPHEN M. SCHERR, AND
ALEXANDRA BROOKS,

          Defendants.

Case No. 2:24-cv-00513-JLB-KCD

## MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS

This case arises from an attempt, following Hertz Global Holdings, Inc.'s ("Hertz") 2021 bankruptcy, to reinvent Hertz as a "first mover" to become the largest renter of electric vehicles ("EV") in the world. To that end, Defendants sought to build an EV fleet comprising 25% of Hertz's overall fleet by the end of 2024. Yet, unbeknownst to investors, Hertz lacked an established EV charging infrastructure or the funds to build one. Defendants proceeded full speed ahead anyway, announcing in October 2021 that Hertz agreed to acquire 100,000 Tesla EVs by the end of 2022.

By mid-2022, Hertz had already experienced a significant decline in EV demand and utilization for two primary reasons: (i) there were not enough charging stations to service its EV fleet and (ii) driver inexperience with operating EVs. EV demand and utilization remained low throughout the Class Period. Yet Defendants falsely told investors that "EV rental demand is very strong and strong across *all* aspects of our

business" and Hertz had "very high levels of utilization." None of this was true. Former Hertz employees responsible for analyzing fleet demand and utilization confirm that companywide meetings and internal reports all showed EV demand and utilization had declined by mid-2022 and remained low throughout the Class Period.

Within about one year, Hertz was forced to shed 50% of its EV fleet, admittedly because "*earlier in 2023*," Hertz had "over fleeted" its EVs, and needed to "tighten[] the EV supply" to "more accurately match[] the fleet to demand" and EVs had "realized lower utilization than what we really want to be at" during the Class Period. Upon these revelations, Hertz's stock price declined 54% causing investor losses.

Defendants do not dispute that Hertz's EV initiative "did not work." DB19.[1] Instead, ignoring Plaintiff's well-pled allegations, Defendants argue that nearly every alleged misstatement is inactionable puffery and there are no facts showing their statements were false when made or with scienter. Taking all reasonable inferences in Plaintiff's favor, including former employee accounts and Defendants' own admissions, Plaintiff states a claim and Defendants' Motion should be denied.

## STATEMENT OF FACTS[2]

Hertz offers car rental services to end customers, as well as rideshare companies through its Ride Share Program. ¶¶24, 25.[3] Starting in late 2021, Hertz sought to build "the largest EV rental fleet in North America and one of the largest in the world." ¶56.

---

[1] "DB" refers to pages in Defendants' Motion to Dismiss the Amended Complaint ("Motion").
[2] Contrary to Defendants' request for judicial notice, DB1 n.1, the Court cannot notice exhibits used, as here, for the sole purpose of undermining the complaint. *Miranda v. Ocwen Loan Servicing, LLC,* 148 F. Supp. 3d 1349, 1353 (S.D. Fla. 2015). Even if the Court does so, it may not do so for their truth as the documents are in dispute. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999).
[3] As used herein, "¶__" and "¶¶__" refer to paragraphs in the Amended Class Action Complaint ("Complaint"). ECF 50. Unless otherwise noted internal quotation marks and citations are omitted.

On October 25, 2021, Hertz announced that it ordered 100,000 Tesla EVs to be received by the end of 2022 in support of its goal to build a fleet comprised of 25% EVs. *Id.* Hertz further stated it would install new EV charging infrastructure sufficient to service its EV fleet. *Id.*

Defendants tracked vehicle demand and utilization, among other KPIs, using Hertz's internal systems: Tableau reported in real-time and by location, car type, utilization by car, cars on rent and other data; CapGuard provided graphical utilization data for each fleet category; and the Rate Management System ("RMS") priced vehicles according to seasonality and demand. ¶¶43-48. According to CWs 1 and 2, Revenue Management ("RM") Analysts responsible for determining rental car pricing and stocking inventory based on demand in their regions, the Individual Defendants had full access to Tableau and CapGuard to review KPIs and other data company-wide. ¶¶19, 20, 50. CW2 also generated bi-weekly "CapGuard" reports that CW2 forwarded to CW2's manager, Defelicio dos Santos ("dos Santos") who circulated them to leadership. ¶¶48-49.

Throughout their tenures, CWs 1 and 2 attended monthly RM All Hands meetings with analysts and managers from all five sales regions, in addition to Darren Arrington, EVP of RM & Fleet Acquisition, who reported to Defendant Scherr. ¶¶22, 39-40, 75. During these meetings, participants reviewed slides of monthly KPIs like utilization, cars on road, and revenues. ¶¶39-40, 173, 180. The slides were saved in a folder accessible by Defendants and emailed to management. *Id.*

CWs 1 and 2 confirmed that EV demand and utilization had declined by mid-

2022 because customers did not know how, or want, to use EVs and there were not enough charging stations. ¶¶65-67, 75. CWs 1 and 2 reported that EV demand and utilization was low throughout the Class Period, hovering around 55% to 60% but sometimes going as low as 30% to 35%, and was at least 20-25% less than Internal Combustion Engine ("ICE") vehicle utilization. ¶¶67, 73. CWs 1 and 2 stated that low EV demand and utilization were reflected in Tableau and CapGuard by the latter part of 2022 and throughout 2023 and that the lack of EV demand was raised at the monthly RM All Hands meetings prior to and throughout the Class Period. ¶¶68-69, 75. Thus, Defendants were aware that EV demand and utilization had declined before the Class Period and remained abysmal throughout, yet they told investors "EV rental demand is very strong and strong across all aspects of our business" (¶98) and Hertz was "not seeing demand reduction" for EVs. ¶100.

Moreover, while Defendants publicly claimed Hertz was "accelerating the build-out of EV charging infrastructure…to serve both our customers and the driving public" (¶112), CWs 1 and 2 confirmed that one of the primary reasons customers did not want to rent EVs was the lack of available charging stations. ¶¶65, 76. CW2 stated that Hertz put EVs on the lots for rent before there were any onsite charging stations. ¶76. CW3 corroborated CW2's account, reporting that Hertz did not start installing charging infrastructure until several months after purchasing and receiving EVs. *Id.*

While CW3, an Outside Wholesale Remarketing Representative responsible for selling used vehicles to dealerships, reported that Hertz began selling EVs due to lack of demand in April 2023, Defendants did not disclose that until Q1 2024 when they

finally revealed Hertz would be forced to sell *half* of its EV fleet due to lack of demand. ¶8. On October 26, 2023, during the Q3 2023 Earnings Call, Defendant Scherr admitted that Hertz "underperformed" and needed to "bring [EV] supply in line with natural demand that's being expressed[,]" ¶¶131, 136. Then, on January 11, 2024, Hertz announced the sale of 20,000 EVs (1/3 of its EV fleet) to "better balance supply against expected demand of EVs" and a massive, $245 million write-off, to reduce the asset value of the EVs on its books. ¶¶93, 139. On March 15, 2024, the Company announced Defendant Scherr was stepping down as CEO without explanation. ¶94.

Finally, on April 25, 2024, Defendants disclosed Hertz was taking another massive write-down of EVs for sale of $195 million and would be selling an additional 10,000 EVs, bringing the total EV sales to 30,000, or one half of the EV fleet to obtain the "right fleet size" in line with demand because Hertz "realized lower utilization than what we really want to be at on the EV fleet." ¶¶146-49.

## ARGUMENT

Plaintiff need only "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). On a motion to dismiss, the court accepts all facts pled as true and construes them in the light most favorable to the plaintiff. *Pub. Emples.' Ret. Sys. Of Miss. v. Mohawk Indus., Inc.*, 564 F. Supp. 3d 1272, 1285 (N.D. Ga. 2021). Dismissal is improper "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *In re Immucor Inc. Sec. Litig.*, 2006 WL 3000133, at *7 (N.D. Ga. Oct. 4, 2006).

## I.    The Complaint Adequately Alleges a §10(b) Claim

To state a §10(b) claim, a plaintiff must allege: (1) a material misrepresentation (or omission); (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance (transaction causation); (5) economic loss; and (6) loss causation. *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1295 (11th Cir. 2011). Defendants' Motion only challenge elements (1) and (2).

### A.    False Statements Touting EV Demand and Utilization

Throughout the Class Period, Defendants repeatedly touted that "EV rental demand is very strong and strong across all aspects of our business" (¶98), that Hertz was seeing "continued strength and demand…across all markets" (¶108) and "not seeing demand reduction" for EVs (¶100), and, instead, had seen "a pickup, literally just in the last month or 2 around the take-up of EVs." ¶125. Defendant Scherr, likewise, falsely reassured investors that Hertz was able to "maintain very high levels of utilization" (¶119) and Hertz was "running our fleet at an elevated level of utilization against historical standards." ¶123.

These, and other misstatements[4] were false and misleading when made because: (a) CWs 1 and 2 reported that EV demand and utilization declined and remained low from Q2 2022 throughout the Class Period, with EV utilization 25% less than ICE vehicles per CW1 and between 55-70% in total per CW2, as reflected in Tableau, due to customer inexperience with EVs and lack of charging stations (¶¶65-76); (b) CW3

---

[4] *See also* ¶104 ("corporates are focused on EVs…the corporate business is feeling quite good, very strong"), ¶106 ("demand is not lessening at all"), ¶110 ("continued growth in demand across our customer segments"); ¶116 ("no current evidence of softening demand"); ¶118 ("overall, very strong demand"); ¶121 (seeing "considerable demand" and a "permanent" and "continued strength in the [] demand"); ¶127 ("seeing demand" for EVs in "a number of areas" including corporate and leisure).

stated there was little EV demand throughout the Class Period as evidenced by "tons" of unrented EVs on the lot and Hertz increasing EV sales to dealerships throughout 2023 (¶¶77, 88); (c) Defendants' admission Hertz had to sell 50% of its EV fleet to "tighten[] the EV supply" and "bring our fleet inside the demand curve[,]" as Hertz had "realized lower [EV] utilization than what we really want" (¶¶132-49); and (d) Defendants admittedly were "ahead of ourselves" in purchasing EVs before there was sufficient demand (¶142). *See, e.g., In re Sci. Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351, 1363-64 (N.D. Ga. 2002) (statements demand accelerating actionable where customer orders declining and company scaling back production); *Marrari v. Med. Staffing Network Hldgs., Inc.*, 395 F. Supp. 2d 1169, 1186 (S.D. Fla. 2005) (positive guidance false where defendant "knew demand was falling").

Contrary to Defendants' contention (DB9-10), by speaking about demand for "all" vehicle types and "across our customer segments," Defendants created the false impression that demand for all business segments was strong and/or increasing when EV demand and utilization had significantly declined. ¶¶65-77. Defendants, thus, had a duty to disclose declining EV demand and utilization—particularly as that segment was 25% of Hertz's business and touted as giving Hertz a competitive advantage. *See FindWhat*, 658 F.3d at 1298-99, 1305 (duty to disclose defects within the "enforce[ment]" system voluntarily touted); *In re: Altisource Portfolio Sols., S.A. Sec. Litig.*, 2015 WL 11988900, at *4 (S.D. Fla. Dec. 22, 2015) ("[a] statement is misleading … if it conveyed to the public a false impression.").

Defendants further contend (incorrectly) the CWs should be ignored because they are "three line-level" employees "with limited regional roles" and purportedly no first-hand knowledge of EV demand companywide. DB15-16. Not so. The Complaint provides each CW's title, employment dates, and duties, demonstrating they were "in a position to know," firsthand, the facts asserted. *Monroe Cty. Emps. Ret. Sys. v. S. Co.*, 2018 WL 1558577, at *32 (N.D. Ga. Mar. 29, 2018). Plaintiff alleges:

- CW1: former RM Analyst from before the Class Period through Q3 2023, oversaw Western Sales Region where CW1 determined rental car pricing and inventory based on demand, reporting to Director Michael Cangialosi.  ¶19.
- CW2: former RM Coordinator for Midwest (before the CP to 2/2023, stocked fleet according to demand and tracked KPIs such as utilization) and Security Project Manager (2/2023 – 10/2023, tracked fleet management and utilization) reported to Dos Santos). ¶¶20, 42, 48.
- CW3: former Outside Wholesale Remarketing Representative from before the Class Period to 1/2024, responsible for selling Hertz's companywide used car fleet, reporting to Andre LaRosa. ¶¶21, 181.

Moreover, CWs need not have directly interacted with a defendant (DB15) and allegations that EV demand and utilization were low "throughout" the entire Class Period sufficiently specifies the time period (DB16 at n.9). *Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 484 n.5 (9th Cir. 2019) (crediting CW lacking direct contact with defendant); *In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 248 (S.D.N.Y. 2023) (meetings alleged to occur "throughout" specified period, sufficient) (*citing New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 13 (2d. Cir. 2011) (meetings alleged to occur throughout class period sufficient as to timing)).[5]

---

[5] Defendants' cases are distinguishable. *See Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*, 595 F. Supp. 2d 1253, 1268 (M.D. Fla. 2009) (CW allegations insufficient where merely circumstantial and did not show "the option grants were not actually finalized on September 21, 2001" whereas here, CWs 1 and 2 provide hard facts that EV demand declined and stayed low); *Henningsen v. ADT Corp.*,

Defendants' next argument, that the CWs have no personal knowledge of EV demand *companywide* (DB15-16), ignores that CWs 1 and 2 participated in monthly RM All Hands meetings throughout their tenures **attended by all five of Hertz's sales regions** *and* **Arrington** during which they discussed slide decks reporting that EV demand and utilization were declining and remained down, for each customer category (*e.g.*, corporate, leisure). ¶¶39-40, 75. CWs 1 and 2 also had access to Tableau reporting the same, companywide.

Further, unlike in Defendants' cases (DB17), the CWs are not merely stating their personal opinions about whether expanding into EVs was a good strategy. Rather, the CWs provide firsthand accounts of facts demonstrating EV demand was low throughout the Class Period. *E.g.*, ¶¶65-67 (CW1 stated EV demand declined by mid-2022 and stayed low with utilization at 20-25% less than ICE vehicles); ¶¶69-76 (CW2 stated that by mid-summer 2022, there was no EV demand, and utilization never exceeded 55-60%); ¶77 (CW3 stated EVs were not being rented in 2022 and 2023 so there were always a "ton" on the lot).[6] And Defendants' end of Class Period admissions are not "fraud by hindsight." DB18. They further confirm falsity. *See, i.e.,* ¶132 (10/26/2023, admitting "earlier in 2023", Hertz "over fleeted with EVs" and had to "tighten[] the EV supply" to "more accurately match[] the fleet to demand"); ¶¶8,

---

161 F. Supp. 3d 1161, 1202-3 (S.D. Fla. 2015) (CW accounts of a handful of "disgruntled customers" insufficient when "no alleged effect on the Company's key drivers" and no basis to say applied to "an entire department," whereas here, CWs knew of issues from companywide meetings and system reports); *Miyahira v. Vitacost.com, Inc.*, 2011 WL 13136262 (S.D. Fla. Dec. 8, 2011) (same).

[6] Defendants cannot credibly argue that CW 1 and 2's assertions as to "all" EVs is insufficient to apply to "corporate" EV demand (DB14 at n.7), which is admittedly a material subset of "all." *In re Retek Inc. Secs.*, 2005 WL 1430296 (D. Minn. Mar. 7, 2005) (falsity pled where defendant failed to disclose dealings with one material customer that negatively affected deferred revenue as a whole).

146 (4/25/2024, increasing EV sales to 50% of EV fleet); *In re Heckman Corp. Sec. Litig.,* 869 F. Supp. 2d 519, 539 (D. Del. 2012) (later admissions demonstrated falsity).[7]

## B.    False Statements that Hertz Purchased EVs According to Demand

Defendants also falsely assured investors during the Class Period that while Hertz was building its EV fleet to meet its 25% goal, Hertz would "always remain attentive to customer preference" (¶100), that "[r]egardless of vehicle prices, we will always keep our commitment to fleeting within the confines of demand" (¶102) and that "we remain committed to our strategy of growing fleet to sit inside expected demand[.]" ¶114. These statements were false when made because, despite declining EV demand since Q2 2022, Hertz continued to acquire EVs. ¶¶56-58. The above statements were also false for the reasons set forth in Section 1.A., *supra*. Thus, Hertz was not "fleeting within the confines of demand." *Pension Fund v. Dentsply Sirona Inc.*, 2024 WL 1898512, at *6 (S.D.N.Y. May 1, 2024) (reassurances about "adequate" inventory levels misleading when undermined by lack of demand); *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 104 (D.C. Cir. 2015) (statements misleading because "[r]eferences to amassed inventory" did not convey lack of demand for it).

Defendants' challenges fail for the same reasons as above—by speaking about overall demand, Defendants had a duty to disclose it had purchased EVs, a material

---

[7] Defendants' cases are distinguishable. *In re Foundry Networks, Inc.*, 2002 WL 32354617, at *4-5 (N.D. Cal. June 6, 2002) (statement company achieved "record revenues" not false where allegations of one month slowing sales did not show demand for quarter, "as a whole," was soft, here Plaintiff alleges EV demand was low for the entire Class Period); *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 258 (2024) ("failure to disclose information…*can* support a Rule 10b-5(b) claim…if the omission renders affirmative statements made misleading."); *FindWhat*, 658 F.3d at 1304, 1306 (general statement "June revenue was increasing" not actionable because it did not mention quality of "click traffic," unlike here where Hertz represented increased demand "across *all* aspects of our business" and "across *all* markets").

subset of the overall fleet, far in excess of demand.

    **C.**    <u>**False Statements Claiming Hertz Had Sufficient EV Charging Stations**</u>

Defendants falsely assured investors that "our proprietary network of charging stations continues to grow, so as to service our fleet" and Hertz was "accelerating the build-out of EV charging infrastructure at Hertz locations in major U.S. cities to serve both our customers and the driving public." ¶112. When asked during the August 16, 2023 CNBC Interview about whether Hertz was having trouble renting EVs due to a lack of charging stations, Defendant Scherr falsely assured investors that as demand increased, "capital" to build more charging stations would follow. ¶129.

These statements were false when made because Hertz lacked sufficient charging stations to service its EV fleet, as evidenced by the reasons set forth in Section I.A., *supra*. Moreover, CW1 recalled that even at Hertz's rental locations, it did not have sufficient (or sometimes any) charging stations to keep the EV fleet running. ¶65. Likewise, CW2 stated that, throughout CW2's employment, Hertz's locations did not have onsite charging stations regularly available, and many locations received EVs before there was a charging infrastructure, including St. Louis, which required managers to take the EV offsite to charge them. ¶76. *See, e.g., Brody v. Zix Corp.*, 2006 WL 2739352, at *4 (N.D. Tex. Sept. 26, 2006) (denying motion to dismiss where company overstated product deployments).

Defendants argue in one conclusory sentence in a footnote that these statements are inactionable because Plaintiff failed to plead "Hertz's network of charging stations was not…growing." DB18, n.10. This argument ignores the rest of the misstatement promising growth would be sufficient "to service our fleet" (¶112) and Hertz would

not lose customers "due to a lack of charging stations" (¶129)—neither was true.

### D.    The Alleged Misstatements Were Not Immaterial Puffery

Defendants pluck words and phrases out of context to make the conclusory argument that nearly every alleged misstatement is puffery, without explaining why or how they are immaterial or not subjectively verifiable. DB10-12,14. But statements must be viewed in context and are actionable if grounded in objectively verifiable data. *Tung v. Dycom Indus.*, 454 F. Supp. 3d 1244, 1257 (S.D. Fla. 2020). The inquiry is whether a reasonable investor would rely on and consider such information important. *Edge v. Tupperware Brands Corp.*, 2023 WL 6310236, at *5 (M.D. Fla. Sept. 28, 2023) (statements regarding profitability, price increases, and status of Turnaround Plan not puffery because it was "important information to a reasonable investor."). Defendants' arguments fail for several reasons.

First, Defendants challenge language as puffery that is not even alleged false. ¶116 ("better enables us to serve" demand not alleged false). Second, each of the demand statements are objectively verifiable because either customers were renting EVs and demand was "growing" and had a "take-up" as measured against "historical standards" or not. *See*[8] ¶123 ("**We are running our fleet at an elevated level of utilization against historical standards**"); ¶97 (*responding to CNBC interview question,* "EV rental demand is very strong **and strong across all aspects of our business**."); ¶125 (*responding to question,* "we're seeing continued growth in the utilization of electric vehicles in the corporate space…**without exception, we have seen… the take-up of**

---

[8] For each of the challenged statements, Defendants omitted the bolded language.

**EVs....**").[9] Third, either EVs were being rented, or Hertz had purchased more than it could rent, as can be measured by utilization. *See* ¶102 ("**[r]egardless of vehicle prices**, we will always keep our commitment to fleeting within the confines of demand[,]" promise not to exceed demand even if prices are low); ¶¶100, 114 (same); *E.g., Dycom*, 454 F. Supp. 3d at 1257 (statements "backlog calculations reflect strong performance" and "we are increasingly providing integrated planning…creating more visibility around future revenue" verifiable actions important to investors and not puffery).[10]

EV demand was also important to investors because, as demonstrated above, analysts asked about it every quarter and Hertz's stock price declined upon the announcement of low EV demand. ¶¶202-17. *Nebraska Inv. Council v. Fid. Nat'l Info. Servs., Inc.,* 2024 WL 4349125, at *4 (M.D. Fla. Sept. 30, 2024) (statements "made in response to specific questions from investors" not puffery); *Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 770-71 (9th Cir. 2023) (same).

### E. Defendants' Statements Were Not Forward-Looking And/Or Are Not Protected by Hertz's Purported Cautionary Language

Defendants contend that portions of the alleged false statements in three paragraphs (¶¶110, 125, 129) are nonactionable forward-looking statements. DB12-13.

---

[9] *See also* ¶108 ("continued strength and demand…across all markets"); ¶118 (same); ¶127 (same); ¶119 ("we calibrate the fleet, and we'll take it down to sort of maintain very high levels of utilization"); ¶104 ("corporates are focused on EVs **as an alternative to**… **satisfy their own ESG commitment**…corporate business is feeling quite good, very strong"); ¶100 ("we are not seeing demand reduction today"); ¶106 (same).

[10] Defendants' cases (DB12) are inapposite as none hold use of the term "strong" is, *per se*, puffery and none involved a company's *key metrics* and specified business segments, as here. *See Next Century Commc'ns Corp. v. Ellis*, 318 F.3d 1023, 1028 (11th Cir. 2003) (non-10(b)-5 case referring to company's "strong performance"); *Bhatt v. Tech Data Corp.*, 2018 WL 6504375, at *4 (M.D. Fla. Dec. 11, 2018) ("strong coverage model"); *Cambridge Ret. Sys. v. Mednax, Inc.*, 2019 WL 4893029, at *17-18 (S.D. Fla. Oct. 2, 2019) ("continued strong performance and results" and "strong position"); *Thorpe v. Walter Inv. Mgmt., Corp.*, 2014 WL 11961964, at *12 (S.D. Fla. Dec. 23, 2014) ("strong performance").

Safe harbor protection is only afforded forward-looking statements accompanied by "meaningful cautionary language." *In re Unicapital Corp. Sec. Litig.*, 149 F. Supp. 2d 1353, 1375 (S.D. Fla. 2001). Statements of historical facts are not forward-looking. *In re Physician Corp. of Am. Sec. Litig.*, 50 F. Supp. 2d 1304, 1318 (S.D. Fla. 1999) (no safe harbor protection for "'statements that misrepresent historical/hard…facts.'").

Defendants' challenges fail for three reasons. First, each of the challenged statements are historical facts and, thus, not forward-looking. ¶110 ("We are forecasting nearly 2 million EV rentals in 2023, approximately *5x the number of the prior year*"); ¶125 ("*have seen* in companies…the take-up of EVs…we *will continue to* sort of pursue in the growth in our corporate business"); ¶129 ("to the extent that *we continue to see* growth in ev sale rental utilization…I'm sure it will come as *it is coming now*"). Second, Defendants concede that only ¶110 was preceded by cautionary language. DB13. However, the warning was insufficient because the risk—that there would be insufficient EV demand—had already materialized. *S.E.C. v. Merch. Capital, LLC*, 483 F.3d 747, 769 (11th Cir. 2007) (risk disclosure insufficient where risk already occurred) (citing cases). Lastly, Plaintiff alleges Defendants knew their statements were false or misleading and/or lacked reasonable basis because internal reports they received and discussions at company meetings informed them that EV demand significantly declined. *See* Section F, *infra*.

**F.     The Complaint Adequately Alleges a Strong Inference of Scienter**

To adequately plead scienter, plaintiff must allege facts supporting either recklessness or conscious misbehavior. *See Abrams v. MiMedx Grp., Inc.*, 37 F. Supp. 3d

1271, 1277 (N.D. Ga. 2014). Severe recklessness is an "extreme departure from the standards of ordinary care" that presents "a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Sci. Atlanta*, 239 F. Supp. 2d at 1365. An inference is "strong" if it is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). Because this inquiry examines "whether all of the facts alleged, *taken collectively*, give rise to a strong inference of scienter," courts must "consider the complaint in its entirety[.]" *Id.*

Here, Plaintiff's inference—that Defendants were aware of Hertz's declining EV demand and utilization through reports, internal systems and meetings, among other ways, but concealed it from the market in order to be first to and obtain the largest share of the EV rental market, while otherwise avoiding bankruptcy and achieving compensation goals—is at least as compelling as Defendants' opposing inference that Hertz's EV strategy "in the end it did not work out as hoped." DB19.

### 1. Defendants' Admissions Support a Strong Inference of Scienter

Defendants' end of Class Period admissions directly contradicting their Class Period misstatements create a strong inference of scienter. *S. Ferry LP # 2 v. Killinger*, 687 F. Supp. 2d 1248, 1259 (W.D. Wash. 2009) (scienter where defendant admitted "[w]e did not complete integration"); *Heckman,* 869 F. Supp. 2d at 539 ("admissions alone show that defendants were aware, and chose not to disclose, information that a reasonable shareholder would like to know").

On October 26, 2023, Defendants admitted that "earlier in 2023," Hertz had moved EVs out of ride share into leisure without regard to demand, causing the leisure segment to be "over fleeted with EVs," requiring Hertz to "tighten[] the EV supply" to "more accurately match[] the fleet to demand[.]" ¶¶132-33, 136. On January 11, 2024, Defendants admitted that Hertz was selling one-third of its EV fleet due to lack of demand because Hertz got "ahead of ourselves" by expanding the EV fleet before there was demand. ¶¶139, 142. Then, on April 25, 2024, Defendants admitted Hertz would be selling 50% of its EVs purchased just one year earlier, so the "EV fleet will be better aligned with attractive demand for EVs," as EVs had "realized lower utilization than what we really want to be at" during the Class Period. ¶¶148-49. Defendants' admissions, particularly coupled with the fact Hertz had to sell *one-half* of its EV fleet *within one year* of purchase, creates a strong inference that Defendants knew or recklessly disregarded that EV demand and utilization had declined.

Defendants' claim their admissions are just adjustments to Hertz's goals after they concluded the "EV strategy had not worked as expected" (DB21) ignores their admission that it was "earlier in 2023" that they knew of the adverse facts.

### 2. Defendants' Access to Internal Company Reports and Attendance at Meetings Supports Scienter

According to CW1 and CW2, Defendants had access to the Tableau system, which showed, in real-time for all sales regions throughout the Class Period, that EV demand and utilization had declined and remained low. ¶¶168-69. CW1 further stated that Defendants could access the CapGuard system, which showed throughout the Class Period that EV demand and utilization were declining based on the ratio of EV

cars rented to those that were still on the lot. ¶¶170-72. Defendants also had access to decks from monthly RM All Hands meetings showing declining EV demand and utilization (¶173) and CW3 reported that CW3's manager, Andre LaRosa, provided Defendants with monthly reports on EV sales from April to the end of 2023 showing EVs available-for-sale increased due to lack of EV demand. ¶181. In fact, Defendants admit they monitor demand data, stating "[w]e sit on a lot of [data]. We know where cars are going, we know where people are going.…" ¶174; ¶175 (we "see the booking patterns of our customers. We…measure their desires in terms of fleet preferences.").

Defendants argue the above allegations are insufficient because Plaintiff does not allege Defendants reviewed the reports. DB21-22. Defendants' access to information contradicting their public statements, however, is sufficient. *Tupperware*, 2023 WL 6310236, at *5 ("Where a defendant publishes a statement at a time he […] **has access to** facts suggesting that the statement is inaccurate, misleadingly, or incomplete…a classic fact pattern giving rise to a strong inference of scienter appears.") (quoting *In re Sensormatic Elecs. Corp. Sec. Litig.*, 2002 WL 1352427, at *6 (S.D. Fla. June 10, 2002)). Plaintiff adequately alleges the who, what, when, where— the names of each system and report (*e.g.*, Tableau and Capguard and slides from All Hands meetings), the specific data included (*e.g.*, vehicles on rent, utilization), and what negative information they conveyed (*e.g.*, EVs demand and utilization had declined) and how often the reports were generated (*e.g.*, real time and monthly).[11]

---

[11] Unlike Defendants' cases (DB20-22), Plaintiff alleges Defendants' own admissions and receipt of, and access to, internal reports showing EV demand and utilization had declined throughout the Class Period. *See Kinnett v. Strayer Educ., Inc.*, 2012 WL 933285, at *12-13 (M.D. Fla. Jan. 3, 2012) (no

Further, that Defendant Scherr's direct report, Arrington, attended the monthly RM meetings where declining demand was discussed supports scienter. *Tupperware*, 2023 WL 6310236, at *6 (that CW1 attended meetings with defendant's "direct report" where issues discussed supported scienter).

### 3.     The Importance of EV Growth and Executive Departures

Defendants do not dispute that Hertz was laser-focused on being first to market with EV rentals. Indeed, most of Hertz's new car purchases during the Class Period were EVs. The importance of Hertz's EV fleet adds to the scienter inference. *See Schultz v. Applica Inc.*, 488 F. Supp. 2d 1219, 1226 (S.D. Fla. 2007) (inferring scienter where product line played an "important role…in financial projections"); *In re Netbank, Inc. Sec. Litig.*, 2009 WL 2432359, at *5-6 (N.D. Ga. Jan. 29, 2009) (sustaining complaint where misstatements regarded issuer's core business).

Contrary to Defendants' contention (DB22-23), Plaintiff alleges that in just one year, five members of senior management departed at suspicious times: (i) CFO Kenny Cheung left on 3/27/23—the same time CW2 said Hertz raised EV prices due to lack of demand; (ii) COO Paul Stone resigned on 9/13/23 right before Hertz reported disappointing Q3 2023 results; (iii) Board member Jeffrey Nedelman inexplicably resigned on 1/15/24, just four days after Hertz revealed it would be selling one-third of its EVs; (iv) Defendant Scherr stepped down as CEO effective 4/1/24, right before Hertz released Q1 2024 results reporting it would be selling one-half of its EVs; and

---

allegation defendant knew about improper practices); *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1264-65 (11th Cir. 2006) (no scienter where confusing allegations and plaintiff failed to allege what was discussed at meetings); *Mogensen v. Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1220-21 (M.D. Fla. 2014) (no scienter where CWs do not provide any details of what reports contained).

(v) on 6/3/24, Defendant Brooks resigned, shortly after Hertz revealed it was selling half its EVs and massive losses from EV write-offs. ¶186. These numerous executive departures support a strong inference of scienter because Plaintiff "alleges sufficient information to differentiate between a suspicious change in personnel and a benign one." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009); *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1246 (N.D. Ga. 2019) (scienter pled where CEO resigned after public disclosure of incident).[12]

### 4.    Defendants' Motive Supports Scienter

While Plaintiff is not required to allege motive, *Tellabs*, 551 U.S. at 310 ("absence of a motive allegation … is not fatal"), he has here:

- Avoidance of Debt Covenant Violations to Raise Capital: Defendants needed to avoid negative charges to EBITDA from writing off unused EVs because it would violate debt covenants and put Hertz into a second bankruptcy. ¶¶188-91. In turn, bankruptcy would prevent Hertz from raising capital to finance the acquisition of ICE vehicles and build an EV charging infrastructure. ¶¶192-94.

- Obtain Compensation: Defendant Scherr could only receive his sign-on RSUs if Hertz's stock price achieved a certain price.  ¶196. As a February 4, 2022 Financial Times article reported, Scherr stood to receive at least $250 million depending on how Hertz's stock performed, characterized as a "windfall" that would exceed his compensation as a Goldman Sachs investment banker. ¶197.

Defendants' argument that the above motives do not support scienter because

---

[12] Defendants' cases (DB18-23) are distinguishable because unlike there, Plaintiff here alleges Defendants' access to and/or receipt of negative data from internal reports and meetings that they ignored and subsequent departures at suspicious times. *Gonzalez v. Cano Health, Inc.*, 2024 WL 4415216, at *12-13 (S.D. Fla. Oct. 4, 2024) (allegations of a "significant portion" of revenue "could be seen as critical to Cano Health's core operations" but absent allegation defendants "ignored meaningful reports'" limited their weight); *Rosenberg v. Gould*, 554 F.3d 962, 966 (11th Cir. 2009) (defendant resignation insufficient where plaintiff alleged no knowledge of accounting principles violated); *Maverick Fund, L.D.C. v. Lender Processing Servs. Inc.*, 2015 WL 5559761, at *12-13 (M.D. Fla. Sep. 21, 2015) (termination insufficient as timing not alleged suspicious); *City of Hollywood Police Officers' Ret. Sys. v. Citrix Sys., Inc.*, 649 F. Supp. 3d 1256, at 1275-76 (S.D. Fla. 2023) (resignation insufficient where plaintiff alleges mere "operational shortcomings" due to poor performance).

they are merely general corporate motives (DB19) ignores that such motives were tied to Hertz's survival, *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 n.8 (9th Cir. 2000) (motive based on need to "raise financing"), and defendants' personal gain. *See Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1029-30 (N.D. Cal. 2020); *No. 84 Emp. Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944-45 (9th Cir. 2003) (scienter found where "executive bonuses were based principally on the company's financial performance"); *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 603 (N.D. Cal. 2019) (scienter where the "executives' compensation from stock and cash awards far outstripped their base salaries").[13]

## II.　The Complaint Adequately Alleges a §20(a) Claim

Defendants do not contest their Section 20(a) liability. If the Court finds an adequately pled 10(b) violation, it should also sustain the unchallenged 20(a) claims.

## CONCLUSION

Wherefore, Defendants' Motion should be denied in its entirety. If this Court grants any part of the motion, Plaintiff respectfully requests leave to amend.

Dated: November 21, 2024　　　　　　　　Respectfully submitted,

Shannon Hopkins, *admitted pro hac vice*　　By: *Cullin Avram O'Brien*
**LEVI & KORSINSKY, LLP**　　　　　　Cullin Avram O'Brien
1111 Summer Street, Suite 403　　　　　　**CULLIN O'BRIEN LAW, P.A.**
Stamford, CT 06905　　　　　　　　　　6541 NE 21st Way
Tel: (212) 992-4523　　　　　　　　　　Ft. Lauderdale, FL 33308
Email: shopkins@zlk.com　　　　　　　　Tel: (561) 676-6370
*Lead Counsel for Plaintiff and the Class*　　Email: cullin@cullinobrienlaw.com
　　　　　　　　　　　　　　　　　　　*Liaison Counsel for Plaintiff and the Class*

---

[13] *Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d 1307, 1338 (S.D. Fla. 2004) is inapposite because there, plaintiff generally alleged a desire to increase value of stock options already received whereas here, Plaintiff alleges Scherr stood to receive a $250m "windfall" sign-on award. ¶¶195-97.